UNITED STATES, Appellee,

v.

Specialist Kenji M. MAPES, United
States Army, Appellant.

ARMY 9900592.

U.S. Army Court of Criminal Appeals.

30 July 2002.

**570**

For Appellant: Frank J. Spinner (argued); Captain David S. Hurt, JA (on brief); Major Imogene M. Jamison, JA.

For Appellee: Captain Susana E. Watkins, JA (argued); Major Daniel G. Brookhart, JA (on brief); Colonel Steven T. Salata, JA; Lieutenant Colonel Denise R. Lind, JA; Major Paul T. Cygnarowicz, JA; Captain Theodore C. Houdek, JA (on supplemental brief).

Before CAIRNS, Senior Judge, CHAPMAN, and BROWN, Appellate Military Judges.

## OPINION OF THE COURT

CAIRNS, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his conditional guilty pleas, of conspiracy to obstruct justice, false official statement, wrongful use of heroin (two specifications), wrongful distribution of heroin, wrongful introduction and distribution of heroin on a

military installation,[1] and involuntary manslaughter, in violation of Articles 81, 107, 112a, and 119, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 912a, and 919 [hereinafter UCMJ]. The court-martial sentenced the appellant to a dishonorable discharge, confinement for nine years, forfeiture of all pay and allowances, and reduction to Private E1. Pursuant to a pretrial agreement, the convening authority approved confinement for seven years and the remainder of the sentence as adjudged. The case is before this court for review under Article 66(c), UCMJ, 10 U.S.C. § 866(c).

## Background

Specialist (SPC) Coffin died of an overdose of heroin on 5 April 1998. Based on the evidence developed during the initial investigation, the government suspected that the appellant and Private (PVT) Smoyer delivered the lethal dosage of heroin to SPC Coffin. On 15 July 1998, the convening authority granted testimonial immunity to both suspects.[2]

On 22 July 1998, the appellant was the first of the two suspects to be interviewed under the grants of immunity. Two separate Criminal Investigation Command (CID) teams had been established to conduct independent investigations of the appellant and PVT Smoyer. The evidence does not reflect what, if anything, the appellant told CID during his initial interview. Sometime after CID's interview of the appellant, a separate CID investigative team interviewed PVT Smoyer. However, in accordance with a prior agreement between PVT Smoyer and the appellant, PVT Smoyer lied about and denied their use of heroin with SPC Coffin.

On 2 September 1998, charges were preferred against PVT Smoyer. After preferral, but still during the first week of September 1998, PVT Smoyer informed his father over the telephone of his culpability in the death of SPC Coffin. He also told his father that

---

1. Pursuant to a defense motion, the military judge merged a specification alleging wrongful introduction of heroin onto a military installation with the intent to distribute with another specification alleging the wrongful distribution of the same heroin.

2. Rule for Courts–Martial [hereinafter R.C.M.] 704 provides the authority and procedures for granting testimonial immunity, which protects the immunized person from the use of any immunized statements and any information derived directly or indirectly therefrom in a later trial by court-martial.

the government was offering a pretrial agreement that would limit confinement to eight years. Private Smoyer's father firmly advised his son to not accept the deal. Despite this advice, PVT Smoyer later informed his father that he had made a definite decision to accept the deal because he was confident of the prosecution's ability to convict him and he did not "want to risk being in jail too long." At the time he made the decision to plead guilty, PVT Smoyer was confident that the appellant would stand by his agreement not to cooperate. In fact, PVT Smoyer's defense counsel had told him that the appellant had disobeyed an order to testify under the grant of immunity. Private Smoyer made the decision to plead guilty and to cooperate prior to notification of his Article 32, UCMJ, investigation and of the witness list that included the appellant's name.

On 29 September 1998, the appellant testified at PVT Smoyer's Article 32, UCMJ, investigation that he provided the heroin with which PVT Smoyer injected SPC Coffin. The next day, PVT Smoyer gave an immunized statement to CID admitting that he injected SPC Coffin with heroin that appellant supplied. The government preferred charges against the appellant on 3 December 1998.

At trial, the appellant moved to dismiss the charges on the grounds that the government violated his Fifth Amendment right against self-incrimination by using his immunized statement to induce PVT Smoyer to testify against the appellant. The appellant advanced three theories as to how the government violated his rights.

First, the appellant asserted that PVT Smoyer's statements incriminating the appellant were made only after the appellant testified under a grant of immunity against PVT Smoyer at his Article 32, UCMJ, inves-tigation. The appellant argued that PVT Smoyer's statements were induced by, and therefore derived from, the appellant's own immunized statements. The appellant further argued that the government's decision to prosecute him was based upon PVT Smoyer's tainted statements, in violation of the principles established in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

Second, the appellant asserted that the government breached a so-called "Chinese wall"[3] erected at the time immunity was granted to separate the investigations and the prosecutions of the two suspects. The appellant alleges that the breach occurred when Special Agent (SA) Hill, the CID Special Agent–in–Charge (SAC), had access to the separate investigative files pertaining to each suspect, made entries in both files, and spoke to members of each prosecution team regarding their separate investigations.

Third, the appellant asserted that the staff judge advocate (SJA) and the convening authority had access to his immunized testimony contained in the Smoyer report of investigation under Article 32, UCMJ, at the time the convening authority referred the charges against the appellant. Even though the evidence demonstrated that neither the SJA nor the convening authority had read the report of investigation or had any knowledge of the content of the appellant's testimony, the appellant argued that the convening authority's decision to refer charges against him was tainted simply because the convening authority had access to the appellant's immunized testimony against PVT Smoyer.

After a thorough *Kastigar* hearing, the military judge made findings of fact, entered conclusions of law, and denied the appellant's

---

**3.** A Chinese wall is a term commonly used to describe measures implemented by law firms to screen a disqualified attorney from participating in the representation of a client, so as to avoid ethical conflicts of interest. See the definition below:

A screening mechanism that protects client confidences by preventing one or more lawyers within an organization from participating in any matter involving that client. . . . Creating [a Chinese] wall generally entails (1) prohibiting certain lawyers and paralegals from having any connection with the matter; (2) banning discussions with or transfer of documents to those individuals; (3) restricting access to files; and (4) educating all members of the firm, corporation, or entity about the separation of the lawyers and paralegals (both organizationally and physically) from the pending matter. *Black's Law Dictionary* 573 (7th ed.1999).

motion.[4] Thereafter, the appellant entered conditional pleas of guilty pursuant to R.C.M. 910(a)(2). Before this court, the appellant's sole assignment of error asserts that:

APPELLANT WAS DENIED HIS FIFTH AMENDMENT RIGHT AGAINST SELF–INCRIMINATION WHEN THE MILITARY [JUDGE] RULED THAT APPELLANT'S GRANT OF IMMUNITY WAS NOT VIOLATED BY THE GOVERNMENT'S USE OF HIS IMMUNIZED STATEMENTS TO SUCCESSFULLY PROSECUTE AN ACCOMPLICE WHOSE STATEMENTS WERE THEN USED TO PROSECUTE APPELLANT.

### Facts

#### a. Pre–Immunity Evidence

Before the convening authority granted the appellant immunity and ordered him to testify, the government had evidence of the following facts. The evening before SPC Coffin's death, the appellant was returning from leave in New York. He telephoned PVT Smoyer and stated that he was "bringing the shit back," which meant that he was returning with heroin. Private Smoyer purchased syringes that same evening.

Witnesses saw the appellant, PVT Smoyer, and SPC Coffin together in the appellant's barracks room during the late evening hours before SPC Coffin's death. Private Smoyer and the appellant looked high, and SPC Coffin was "wheezing and looked bad," and passed out. The appellant told one witness that SPC Coffin was just tired.

The following morning the appellant found SPC Coffin in SPC Coffin's room, lying face down in a pool of vomit. When the emergency medical team arrived, the appellant did not inform them that SPC Coffin had used heroin. Specialist Coffin died at the hospital about an hour later from a massive overdose of heroin. A toxicologist and pathologist

opined that, had a heroin antidote been administered, SPC Coffin's life might have been saved.[5]

After SPC Coffin died, the appellant told another soldier that "if" SPC Coffin used heroin, "it was only a little." Additionally, Private First Class (PFC) Wilson told investigators that, on a previous occasion, he had used heroin supplied by the appellant and injected by PVT Smoyer while all three were in the appellant's room. According to PFC Wilson's statement, the appellant told PFC Wilson that PVT Smoyer was better at injecting heroin than the appellant. Private Smoyer admitted, before immunity was granted, that he had used drugs with the appellant and PFC Wilson. The government also knew that PVT Smoyer had previously received nonjudicial punishment for use of heroin, and the appellant had been similarly punished for use of marijuana.

#### b. Prosecutorial Intent Prior To Grants Of Immunity

Based on the strength of the available evidence at the end of June 1998, the prosecutors, Captains T and S, believed they had probable cause to charge both the appellant and PVT Smoyer with involuntary manslaughter, wrongful distribution of heroin, and wrongful use of heroin. They believed that the appellant brought heroin back from New York the evening before SPC Coffin's death and that PVT Smoyer injected SPC Coffin with the heroin in the appellant's barracks room. The government believed PVT Smoyer injected SPC Coffin because: (1) PVT Smoyer purchased the syringes; (2) when PFC Wilson, PVT Smoyer, and the appellant had previously used heroin together, the appellant had told PFC Wilson that PVT Smoyer was better at injecting; and (3) PVT Smoyer had previously injected PFC Wilson.

---

4. A copy of the pertinent part of the transcript containing the military judge's ruling is attached at the appendix.

5. This evidence implied that medical personnel exercised due care and were not negligent by their failure to administer a heroin antidote. Because neither the appellant nor PVT Smoyer

were willing to disclose their friend's use of heroin, the medical personnel did not know that SPC Coffin was suffering from an overdose of heroin and presumably could not diagnose SPC Coffin's overdose in time to administer the antidote.

The prosecutors and their supervisory chain decided to recommend that the convening authority grant use immunity to both the appellant and PVT Smoyer in order to strengthen their cases. Captain S would not concede during the *Kastigar* hearing that the evidence assembled prior to the grants of immunity was insufficient to satisfy the government's burden of proof beyond reasonable doubt, but he stated that their strategy was to grant immunity, to "learn more information from the immunity grants," and to charge the soldiers later. The SJA testified, however, that "the investigators and the prosecutor thought that we should pursue prosecution against the individuals and that the only way that we were going to be able to pursue prosecution was probably to grant immunity."

### c. Post–Immunity Chinese Wall

After the convening authority granted immunity to both suspects, the government formed two prosecution teams and erected a Chinese wall to keep the two investigations separate. One team was to investigate the appellant and to pursue leads generated by any immunized statements given by PVT Smoyer. The other team was to investigate PVT Smoyer and to pursue leads generated by any immunized statements given by the appellant. The teams were not to discuss their respective cases with each other. Each team consisted of a trial counsel, an assistant trial counsel, a judge advocate supervisor, a paralegal, and two CID agents.

Each team was given a copy of the original CID file from which two separate investigative files were created and maintained separately. When the Chinese wall was erected, the senior prosecutor did not want the CID SAC, SA Hill, involved as a supervisor over either investigation. However, SA Hill insisted that, in order to satisfy CID regulations and inspector general (IG) oversight inspections of CID operations, he needed to review the separate investigations periodically. Special Agent Hill assured the senior prosecutor that his role was only to ensure timely investigations and compliance with CID regulations. The senior prosecutor emphasized to SA Hill that he could not in any manner direct either investigation, and SA

Hill understood that. In conducting his periodic reviews, SA Hill made notes in the files to document for the IG the fact that he had conducted his review.

In one such entry in the appellant's investigative file, SA Hill wrote, "Concur w[ith] re-interview [sic] [of PVT Smoyer]. Make it happen...[b]e aggressive." Special Agent Hill testified that he made the entry as encouragement—as "a benign pat on the back" for the investigators. Before SA Hill made his entry, the investigative team that interviewed PVT Smoyer concluded that he was not truthful and should be reinterviewed. Special Agent Hill wanted to document for the IG that he "was engaged[,] and [he] was giving guidance." The investigators and the trial counsel testified that SA Hill's entry had no effect on their investigation because they fully intended to reinterview PVT Smoyer before SA Hill made his entry.

### Law

A general court-martial convening authority may grant a soldier immunity from the use of testimony, statements, or any other information derived directly or indirectly from such immunized testimony or statements in a subsequent court-martial. R.C.M. 704(a) and (c). After receiving such immunity, an immunized soldier may be ordered to give a statement or to testify because the grant of immunity removes the right to refuse to cooperate on self-incrimination grounds. *See* R.C.M. 704(d) discussion; Military Rule of Evidence [hereinafter Mil. R. Evid.] 301(c). Neither the testimony of an immunized soldier, nor any evidence derived from such testimony, may be used against the immunized soldier at a subsequent trial, other than for perjury, false swearing, making a false official statement, or failure to comply with an order to testify. *See* Mil. R. Evid. 301(c).

█ Where an immunized soldier is subsequently prosecuted for matters related to the immunized testimony, the prosecution must meet a heavy burden to show that neither the immunized testimony nor any derivative evidence is used in any way in the prosecution. *See* R.C.M. 704(a) discussion; *United States v. Youngman*, 48 M.J. 123, 127 (1998) (citations omitted). In this regard, the pros-

ecution has an "affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. at 460, 92 S.Ct. 1653.

■ When A testifies under a grant of immunity against B, who then testifies against A, the evidence of B's state of mind and his motivation for testifying against A are directly relevant in determining whether B's testimony was derived from A's immunized testimony. *See United States v. Boyd*, 27 M.J. 82 (C.M.A.1988); *United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976). The government must satisfy a heavy burden to show that B's testimony was not induced by or derived from A's immunized testimony. *Id.* Such tainted testimony is forbidden. *United States v. Rivera*, 1 M.J. 107 (C.M.A. 1975).

■ The protection afforded by immunity extends to nonevidentiary uses of the immunized testimony, including the decision to prosecute. *United States v. Kimble*, 33 M.J. 284 (1991). The government may not prosecute a case against an immunized soldier unless it can show by a preponderance of the evidence that the decision to prosecute was untainted by the immunized testimony. *United States v. Olivero*, 39 M.J. 246, 249 (C.M.A.1994). If the decision to prosecute was made before the grant of immunity, the government has satisfied its burden. *Id.*

■ Our standard of review in this case is clear:

Whether the [g]overnment has carried its burden to show, by a preponderance of the evidence, that prosecution is based on sources independent of immunized testimony is a preliminary question of fact. A military judge's finding that the decision to prosecute and that all prosecution evidence is independent of the immunized testimony should not be overturned on appeal unless it is clearly erroneous or unsupported by the evidence.

*United States v. McGeeney*, 44 M.J. 418, 423 (1996) (citations omitted).

## Discussion

### a. Private Smoyer's Statements Not Derived From The Appellant's Immunized Statements

■ The military judge found by a preponderance of the evidence that the appellant's immunized statements "played no role in [PVT] Smoyer's decision to provide statements" against the appellant, and that PVT Smoyer's statements "were wholly independent, both as to content and purpose, from [the appellant's] compelled immunized testimony." The military judge further found as fact that PVT Smoyer's sole purpose in telling the truth to his attorney and then to CID was "to cut his losses by obtaining a favorable pretrial agreement." These findings are fully supported by the evidence and are, therefore, not clearly erroneous. Accordingly, we will not disturb them or the military judge's conclusion that PVT Smoyer's immunized statements were not derived from the appellant's own immunized statements.

The evidence paints a clear picture that PVT Smoyer decided to cooperate and render truthful statements after concluding that he was in serious jeopardy of conviction based on evidence wholly independent of appellant's immunized statements. Most persuasive of these facts is PVT Smoyer's testimony, corroborated by his attorney, that at the time PVT Smoyer decided to cooperate, he did not know that the appellant had rendered a statement and he continued to believe that the appellant would not incriminate him. Private Smoyer's decision to cooperate was made well before his Article 32, UCMJ, investigation and before he was notified that the appellant's name was on the witness list. Private Smoyer's father corroborated both the timing of his son's decision and his motivation to cooperate in order to obtain a favorable pretrial agreement.

We agree, as a matter of fact, that PVT Smoyer's willingness to testify against the appellant was neither induced by the appellant's immunized testimony nor derived therefrom. Accordingly, as to this allegation, the government has met its burden to show nonuse of the appellant's immunized testimony under R.C.M. 704. There was no violation of the protections afforded by the grant

of immunity under R.C.M. 704, Mil. R. Evid. 301, or military precedents.

### b. Decision To Prosecute Untainted By The Appellant's Immunized Statements

■ The military judge found by a preponderance of the evidence that the decision to prosecute the appellant and PVT Smoyer was made prior to the grants of immunity. As for the appellant's assertion that the decision to prosecute him was tainted by the convening authority's access to his immunized testimony at PVT Smoyer's Article 32, UCMJ, investigation, the military judge specifically found that, when the SJA advised the convening authority regarding the referral of the case against PVT Smoyer and his offer to plead, neither the SJA nor the convening authority had any knowledge of the appellant's immunized statements. These findings are more than adequately supported by the evidence.

At the time the SJA advised the convening authority of PVT Smoyer's offer to plead guilty, the Article 32, UCMJ, report of investigation had not even been completed. Therefore, the summary of the appellant's testimony that would ordinarily accompany the report was not available at that time. The SJA testified that he never read the appellant's testimony, never learned of its contents, and never discussed it with the convening authority. Although the report was complete at the time the convening authority referred the cases against PVT Smoyer and the appellant, the SJA affirmed that he did not read the report, did not possess it when he advised the convening authority, and that he did not give the report to the convening authority. Although it must be conceded that the convening authority "had access"—in a general sense—to the appellant's immunized testimony, the evidence adduced at the *Kastigar* hearing shows that the convening authority had no knowledge of its contents. Therefore, as for the convening authority's decision to refer the case, the appellant's immunized statements played no role in the decision to prosecute. The military judge's findings in this regard were not clearly erroneous.

Similarly, we cannot conclude that the military judge was clearly erroneous when he found by a preponderance of the evidence that the government intended to charge and prosecute the appellant prior to the grant of immunity. As the military judge recounted in his findings, the prosecution possessed adequate independent evidence prior to the grants of immunity that amounted to probable cause to believe that the appellant was guilty of involuntary manslaughter and the drug offenses. The evidence included: (1) SPC Coffin died from a massive overdose of heroin; (2) SPC Coffin was seen in the appellant's room hours before he died, and he was wheezing and did not look well; (3) the appellant and PVT Smoyer were seen with SPC Coffin in the appellant's room hours before SPC Coffin died; (4) PVT Smoyer purchased syringes that evening; (5) the appellant told PVT Smoyer that evening that he was bringing back drugs from New York; (6) the appellant and PVT Smoyer previously had used heroin together and with other soldiers; and (7) on one occasion, PFC Wilson used heroin supplied by the appellant and injected by PVT Smoyer in the appellant's room.

The military judge further found that the government had already decided to prosecute both soldiers as evidenced by the simultaneous grants of immunity, the deliberate and careful planning in erecting the Chinese wall, and the special steps taken to ensure all parties understood the requirements of and necessity for the separate investigations. The fact that the appellant was extended on active duty also evidenced the government's decision to prosecute him. All of these findings are supported by the evidence and bolster the conclusion that the decision to prosecute was untainted by the appellant's immunized statements and testimony. As the military judge's findings were not clearly erroneous, we will not disturb them on appeal.

Although the military judge did not address the divergent views regarding the strength of the cases as expressed in the prosecutor's testimony and that of the SJA, we do not see that as significant. It is obvious that all of the government's lawyers treated these cases as though the convening

authority would ultimately refer them to trial by courts-martial and took a number of steps indicative of a concerted intent to prosecute before immunity was granted. While one may quibble about who intended what, we are satisfied that the government established by a preponderance of the evidence that the decision to prosecute was not tainted by the appellant's immunized statements or testimony.

### c. The Chinese Wall Not Breached

■ The military judge made detailed findings of fact supporting his factual conclusion that the Chinese wall was not breached during the investigation and prosecution of the appellant. We find no basis to conclude that his findings were clearly erroneous. We need only address the appellant's assertion that the wall was breached because SA Hill had access to the separate investigative files, made comments in them, and talked to the separate teams about their investigations.

At the outset, we agree with the senior prosecutor's initial reaction that, once immunity was granted and the Chinese wall was erected, SA Hill should not have undertaken any oversight responsibility over both of these separate investigations. Although the Criminal Investigation Command has a legitimate interest in the oversight of investigations conducted by their agents, we believe the better practice under these facts would be to have a SAC from another installation oversee one of the teams while SA Hill provides oversight of the other. That being said, we do not find that SA Hill breached the Chinese wall by the oversight he exercised in this case. He neither shared information between the teams nor used the appel-

lant's immunized statements in any way to influence the investigation against the appellant.

Consistent with the military judge's findings is the fact that SA Hill's written entry reinforcing the appellant's team's decision to reinterview PVT Smoyer had no impact on the team investigating the appellant. The appellant argues that his comment indicates that SA Hill was directing the investigation based on inside information from the Smoyer team, which included the appellant's immunized statement. The record reveals, however, that his comment was intended and perceived to be encouragement of and concurrence in what the appellant's team had already decided. In fact, none of the investigative team's plans, tactics, or decisions was impacted by SA Hill's statement. Moreover, there is ample evidence of SA Hill's respect for the Chinese wall and his exercise of care to avoid any spillover between the two investigations. Special Agent Hill's conduct did not "alter [CID's] investigative strategy." *See McGeeney,* 44 M.J. at 422 (citing *United States v. Harris,* 973 F.2d 333, 336 (4th Cir.1992)). Based on the entire record, we are satisfied that the military judge's findings of fact were not clearly erroneous, and we conclude, as did the military judge, that the Chinese wall was not breached.[6]

### Conclusion

Considering the record as a whole, including the military judge's detailed findings of fact discussed above, we conclude that the government met their heavy *Kastigar* burden to demonstrate nonuse of the appellant's immunized statements in the prosecu-

---

**6.** In our review of the record, we noted a second area of concern regarding the Chinese wall that was not asserted by the appellant in his brief. Special Agent Barone, a member of the Smoyer investigative team, wrote in an agent's activity summary: "File to TC for TC and SAC reviews. All of the people we need to interview that are here, are in Pinon Canyon and will be for another week or so. SA MARTINEZ and SA BREWER [appellant's team] went down there today and we'll see what kind of success they had before planning a trip there." We were concerned that this entry evidenced a sharing of information between the teams. Accordingly, we ordered affidavits from all the members of the respective teams in an effort to determine wheth-

er further proceedings were necessary to resolve this issue. Those affidavits convince us that the Barone entry was an innocent reference to the fact that several witnesses that each team needed to interview were temporarily at a training location and that personnel who train there were often very difficult to locate. The "success" to which he referred was the general availability of the witnesses, not the content of their statements. His entry was designed to avoid the needless expenditure of time and money in trying to interview witnesses who might not be available. We are satisfied that great care was exercised by the agents and trial counsel to maintain an inpenetrable Chinese wall.

tion of the appellant. The litigation during the *Kastigar* hearing at trial shows that the government's evidence was derived from legitimate sources wholly independent of the appellant's compelled testimony or any derivative evidence, that the decision to prosecute was not tainted by the appellant's immunized statements, and that the Chinese wall was not breached.

The findings of guilty and the sentence are affirmed.

Judge CHAPMAN and Judge BROWN * concur.

## APPENDIX

The court finds by a preponderance of the evidence that the following facts are true:

1. The decision to prosecute Specialist Mapes and Specialist [sic] Smoyer * for offenses, including involuntary manslaughter, was made prior to the grants of immunity and creation of the Chinese wall.

2. No member of the prosecution team has seen any immunized statement made by Specialist Mapes.

3. No member of the CID team investigating Specialist Mapes has seen or heard any details about any immunized statement made by Specialist Mapes or any other evidence derived from any immunized statements made by Specialist Mapes.

4. The prosecution did not use Specialist Mapes' Article 32 testimony or any other immunized statement made by him in their decision to prosecute him, nor are they attempting to use any of his immunized statements or testimony against him at his trial.

5. Specialist Smoyer's immunized statements were not derived from Specialist Mapes' immunized testimony or statements. They were wholly independent both as to content and purpose from Specialist Mapes' compelled immunized testimony.

6. The decision to prosecute Specialist Mapes was not in any manner based upon

evidence derived from Specialist Mapes' compelled immunized testimony or statements.

7. When the staff judge advocate briefed the convening authority regarding Specialist Smoyer's offer to plead guilty and the referral of Specialist Smoyer's case to trial, he did not know what Specialist Mapes may have said in his immunized statements. The staff judge advocate did not read the documents supporting the referral, nor did the convening authority. The staff judge advocate did not advise the convening authority about any of Specialist Mapes' immunized statements.

8. The Chinese wall was not breached. The plan for creation of separate investigations was well-conceived and carefully planned. The investigators and prosecutors for both teams were thoroughly briefed about the special requirements of their separate investigations. They understood that they could not share or request information from the other team, and they scrupulously adhered to that limitation. The files were kept separately and not available to members of the other investigation or prosecution team. Neither team disclosed information to members of the other team, and neither team obtained information from the other team. More specifically, the team investigating Specialist Mapes did not receive any information about Specialist Mapes' immunized statements or any other evidence that may have been derived from that evidence. Special Agent Hill made comments in the various investigative reports and the running logs in the investigation. Specialist [sic] Hill's comments were purely administrative in nature and did not disclose to either team evidence found by the other team. Moreover, the investigators understood that Special Agent Hill's comments were purely administrative and that his only role was to ensure that the investigations were conducted in a timely manner and to ensure that operational requirements were achieved.

The court makes the following additionally—makes the additional following specific findings:

---

* Judge BROWN took final action in this case prior to his retirement.

* The military judge mistakenly refers to Private Smoyer as "Specialist Smoyer" throughout this excerpt. *See* R. at 317–326.

1. The decision to prosecute. This court finds by a preponderance of the evidence that prior to the offer of immunity and the creation of the Chinese wall, the prosecution had probable cause to and fully intended to charge and prosecute Specialist Mapes for offenses, including involuntary manslaughter, prior to the offer of immunity. In other words, they had decided to charge Specialist Mapes with offenses, to include involuntary manslaughter.

The court also finds in this regard al-. though the evidence known to the prosecution before immunity was neither formally cataloged or sealed, the evidence known as a result of the investigation to that point was maintained by CID in an original investigative file, Appellate Exhibit VI.

No charges were preferred against either Specialist Mapes or Specialist Smoyer, nor were there any formal charging documents made, prior to the creation of the Chinese wall and prior to the grants of immunity. Nonetheless, it is clear by the independent evidence then known to the prosecution that Specialist Mapes and Specialist Smoyer were the primary suspects in the death of Specialist Coffin. It is also clear that based on what the prosecution had learned, that they had sufficient evidence to believe that Specialist Mapes had supplied the heroin and that Specialist Smoyer had injected the lethal dose of heroin into Specialist Coffin. It was also clear from what they knew that Specialist Coffin had died from a massive dose of heroin; that Specialist Coffin was seen in Specialist Mapes' room shortly before his death; that at the time, Specialist Coffin was wheezing and looked bad; that there was compelling evidence that both Specialist Smoyer and Specialist Mapes were in Mapes' room with Specialist Coffin shortly before Specialist Coffin's death; that Specialist Smoyer had obtained syringes shortly before Specialist Coffin's death; and that Specialist Mapes had brought back heroin from New Orle— from New York earlier in the evening before Specialist Coffin's death. It was also known that Specialist Mapes and Specialist Smoyer had used drugs together, including heroin, previously and with other soldiers. On one of those occasions, Private First Class Wilson used heroin supplied by the accused in the accused's room and was injected by Smoyer.

It was also clear that the prosecution had decided to prosecute Specialist Mapes as is evidenced by the decision to grant simultaneous immunity to Specialist Mapes and 'Specialist Smoyer, the deliberate and carefully planned steps taken by the prosecution to erect the Chinese wall to ensure that both Specialist Mapes and Smoyer could be prosecuted, the care and detail with which all parties were briefed regarding the unusual nature of the investigation and the special requirements with which they were to conduct the separate investigations, the precision with which each investigation was conducted, and in particular the absolute requirement that in no instance could information be shared with anyone outside of their separate investigative team. Other indicators that the prosecution had decided to prosecute Specialist Mapes include the opinion rendered to CID that probable cause existed to title Specialist Mapes for offenses, including manslaughter—involuntary manslaughter—and the government decision to extend Specialist Mapes on active duty so that they could prosecute—so that he could be prosecuted. This court is convinced that regardless of whatever evidence was subsequently discovered by the separate investigations, the decision had been made to prosecute Specialist Mapes for offenses, including involuntary manslaughter.

2. Statements of Specialist Smoyer. This court finds by a preponderance of the evidence that Specialist Smoyer's immunized statement and any other subsequent statements were not derived from Specialist Mapes' immunized testimony or other immunized statements. The court also finds by a preponderance of the evidence that given the state of the evidence, Specialist Mapes' immunized statements played no role in Specialist Smoyer's decision to provide statements. Specialist Smoyer's statements were wholly independent, both as to content and purpose, from Specialist Mapes' compelled immunized testimony. Specialist Smoyer's sole purpose in coming clean with his attorney, in directing her to contact CID so that he could make a statement to CID, and for

providing a statement incriminating himself and Specialist Mapes was to cut his losses by obtaining a favorable pretrial agreement.

In reaching this conclusion, the court carefully considered the testimony and demeanor of Specialist Smoyers [sic] as well as the other witnesses who testified on this issue and finds the following evidence persuasive as to Specialist Smoyer's motivation in presenting his statement to CID when he did. Specialist Smoyer testified that his reason for cooperating with CID; that is, coming— I'm sorry. His reason for cooperating with CID, for coming clean with his father, for telling the truth to his lawyer and directing her to arrange a meeting with CID so that he could provide CID a statement, and for giving the statement incriminating himself and Specialist Mapes was his desire to cut his losses by obtaining a favorable pretrial agreement. He thought he—he knew that he had to admit his involvement in the incident and tell CID the whole truth in order to get the favorable agreement. His decision to come clean with CID was made before the Article 32 investigation, as is evidenced by his discussions with his father, his lawyer— and his lawyer. The decision was not made in anticipation of Specialist Mapes' testimony but, rather, to secure the favorable pretrial agreement. In his statement, Specialist Mapes unequivocally—I'm sorry; Specialist Smoyer unequivocally and clearly admitted that he was the one who injected the lethal dose of heroin into Coffin, which is clearly a more culpable role in the death of Coffin than providing heroin.

The court also finds that under the circumstances of this case, the contents of the statement provided by Specialist Smoyer, although very similar to the details provided by Specialist Mapes, were not derived from Specialist Mapes' Article 32 testimony. The court finds by a preponderance of the evidence that the details provided by Specialist Smoyer in his statement were facts he remembered because of his presence and active involvement in the death of Specialist Coffin in Specialist Mapes' room. His memory of these facts was independent of and in no way influenced by the details provided by Specialist Mapes in the Article 32 investigation and completely independent of Specialist Mapes' Article 32 testimony. His statement is totally supported and corroborated by the independent evidence known to the prosecution prior to the extension of immunity and the creation of the Chinese wall. Again, it should be noted that Specialist Smoyer admitted to being the injector, which, in the court's view, is a more culpable role in the death of Specialist Coffin.

Specialist Smoyer's statement is independently supported by the other evidence presented on the issue. Specialist Smoyer and Specialist Mapes were close friends. Prior to the grants of immunity and the creation of the Chinese wall, they agreed that when questioned by law enforcement investigators, they would deny involvement and that they would protect themselves and each other by not providing statements against each other. Both knew the extent of the other's involvement in the death and that at anytime, either one could incriminate the other. This is evidenced by their statements prior to immunity denying involvement. Specialist Smoyer's false statements to CID after the grant of immunity are completely consistent with this agreement.

Shortly after Specialist Smoyer learned that charges had been preferred against him, he participated in at least three telephone calls with his father. In those phone calls, he told his father about the offenses, advised him about his fear of the possibility of lengthy confinement, and discussed the pretrial agreement with his father, ultimately telling his father that he wanted to take the pretrial agreement.

On Friday, the 11th of September, Specialist Smoyer received notice of his Article 32 investigation and a list of witnesses, including Specialist Mapes. The first opportunity for Smoyer to talk with Captain Bleam about the pretrial agreement was not until Monday, the 28th of September, which was the day before the Article 32. Captain Bleam was out of the office TDY, out of the area and unavailable to Specialist Smoyer, until Monday, the 28th of September, which was the day before the Article 32 investigation. Specialist Smoyer

was not aware of whether Specialist Mapes had been incriminating—had made incriminating statements against him before he received the Article 32 investigation notice. Even after having received the Article 32 investigation notice, he still did not know for sure whether Specialist Mapes would actually testify against him at the investigation or, if he did, whether he would incriminate him.