UNITED STATES, Appellee

v.

Kenji M. MAPES, Specialist
U.S. Army, Appellant

No. 03-0025

Crim. App. No. 9900592

United States Court of Appeals for the Armed Forces

Argued May 12, 2003

Decided September 8, 2003

GIERKE, J., delivered the opinion of the Court, in which EFFRON,
BAKER, and ERDMANN, JJ., joined.  CRAWFORD, C.J., filed a
separate dissenting opinion.

<u>Counsel</u>

For Appellant:  <u>Frank J. Spinner</u> (argued); <u>Captain Mary E. Card</u>
and <u>Captain Craig Harbaugh</u> (on brief); <u>Colonel Robert D.
Teetsel</u>, <u>Lieutenant Colonel E. Allen Chandler, Jr.</u>, and <u>Major
Imogene M. Jamison</u>.

For Appellee:  <u>Major Jennifer H. McGee</u> (argued); <u>Colonel Lauren
B. Leeker</u>, <u>Lieutenant Colonel Margaret B. Baines</u>, and <u>Major
Mark L. Johnson</u> (on brief).

Military Judges:  Richard J. Hough and Keith H. Hodges

   **<u>This opinion is subject to editorial correction before final publication</u>**.

Judge GIERKE delivered the opinion of the Court.

A military judge sitting as a general court-martial convicted Appellant, pursuant to his conditional guilty pleas, of involuntary manslaughter, conspiracy to obstruct justice, false official statement, two specifications of wrongful use of heroin, wrongful distribution of heroin, and wrongful introduction and distribution of heroin on a military installation, in violation of Articles 81, 107, 112a, and 119, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 881, 907, 912a, 919 (2000). The military judge sentenced him to a dishonorable discharge, confinement for nine years, forfeiture of all pay and allowances, and reduction to Private E1. Pursuant to a pretrial agreement, the convening authority reduced the confinement to seven years but otherwise approved the sentence. The Court of Criminal Appeals affirmed. United States v. Mapes, 57 M.J. 569 (A. Ct. Crim. App. 2002). This Court granted review of the following issue:

> WHETHER APPELLANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS DENIED WHEN THE MILITARY JUDGE RULED THAT APPELLANT'S GRANT OF IMMUNITY WAS NOT VIOLATED BY THE GOVERNMENT'S USE OF HIS IMMUNIZED STATEMENTS TO SUCCESSFULLY PROSECUTE AN ACCOMPLICE WHOSE STATEMENTS WERE THEN USED TO PROSECUTE APPELLANT.

For the reasons set out below, we reverse.

### FACTUAL BACKGROUND

#### Initial Investigation into Specialist (SPC) Coffin's Death

On the evening of April 4, 1998, Specialist (SPC) Coffin picked up Appellant, who was returning from leave in New York City, from the Colorado Springs Airport. They returned to Appellant's room in the Fort Carson barracks, and Private (PVT)

2

Ronald Smoyer later joined them there.  That night, Appellant delivered 14 or 15 "dime bags" of heroin to PVT Smoyer who paid Appellant for the drugs.

PVT Smoyer divided a single "dime bag" three ways, and each of the soldiers snorted a line of heroin.  Shortly thereafter, PVT Smoyer "cooked up" more heroin and injected himself and SPC Coffin.  Eventually Appellant and PVT Smoyer helped SPC Coffin back to his barracks room and left him there.

At about 8:00 the next morning, Appellant went to wake up SPC Coffin and found him unconscious.  Appellant sought the assistance of PVT Smoyer to revive SPC Coffin but PVT Smoyer refused to help.  PVT Smoyer then attempted to sanitize Appellant's barracks room and fled with the drugs and drug paraphernalia.  Appellant sought the assistance of duty personnel and administered CPR to SPC Coffin until emergency personnel arrived.  When questioned, Appellant did not reveal to medical personnel any knowledge of SPC Coffin's heroin use the night before and suggested that SPC Coffin may have been suffering from food poisoning.  Attempts to revive SPC Coffin were unsuccessful.

The initial investigation into SPC Coffin's death began immediately.  In Appellant's initial statements to Criminal Investigation Command (CID), he denied any knowledge of SPC Coffin's drug use during the early morning of April 5.  Appellant did reveal that SPC Coffin had been in Appellant's barracks room. Interviews of other servicemembers placed both Appellant and PVT Smoyer with SPC Coffin in Appellant's room.  A consensual search of Appellant's room revealed SPC Coffin's shirt with a syringe in the pocket.

On April 7th, CID received an anonymous unsubstantiated tip that Appellant "had brought drugs back with him off of leave, back to the post, and that could be a possible cause" of SPC Coffin's death. The autopsy revealed that SPC Coffin had died of a massive heroin overdose; however, the medical examiner noted that SPC Coffin's organs did not reflect chronic heroin abuse.

Investigators interviewed SPC Coffin's friends to explore his prior drug use and his relationship with Appellant and PVT Smoyer. These interviews produced information of drug involvement by both Appellant and PVT Smoyer unrelated to SPC Coffin's death, and only circumstantial evidence of their involvement in his death including the following: Several soldiers identified Appellant as a supplier of heroin, and it was rumored that he would bring back drugs from New York City the night of SPC Coffin's death. PVT Smoyer purchased syringes on the afternoon of April 4. Later that day, PVT Smoyer left a party in the mountains, telling other soldiers that he was returning to the barracks to get drugs that Appellant had brought back from New York City. Several soldiers stopped by Appellant's room that night and thought that Appellant, PVT Smoyer, and SPC Coffin looked "high." PFC Marc Wilson admitted that on a previous occasion Appellant had supplied heroin to PVT Smoyer who had, in turn, injected PFC Wilson. A physical examination of Appellant and PVT Smoyer revealed puncture wounds in their arms, but a urinalysis of each revealed no drug use. A laboratory examination of the syringe revealed no evidence of drugs or DNA evidence. PVT Smoyer denied any knowledge of or involvement in

drug abuse related to SPC Coffin's death but implicated Appellant in other drug offenses.

At this point, the suspicion of investigators focused on Appellant as the supplier of heroin and PVT Smoyer as possibly the person who injected SPC Coffin; however, investigators could not directly connect them to SPC Coffin's death. The investigation continued but with little progress.

The Decision to Grant Immunity and

Use of Information Obtained Through the Immunity

The Government decided to grant testimonial immunity to Appellant and PVT Smoyer to gain their cooperation in the investigation. In his written recommendation to grant immunity to Appellant, the staff judge advocate (SJA), Colonel (COL) Joseph Graves, Jr., stated that immunity for Appellant was "needed to establish the charges of distribution and involuntary manslaughter." COL Graves reaffirmed this position later stating that "one of the charges that we wanted to pursue was manslaughter, and we didn't think we were going to get there without grants of immunity to both accused[s]." Because of the investigative impasse, both Appellant and PVT Smoyer were given testimonial immunity on July 8.

Realizing the delicate nature of bilateral grants of immunity, the Government attempted to construct a "Chinese wall" to prevent cross-contamination between the prosecutions of Appellant and the co-accused. The "Chinese wall" was created in an attempt to provide two separate and independent teams, one designated to investigate and prosecute Appellant and another to prosecute PVT Smoyer. Although there were two separate

prosecution teams, both investigative teams were supervised by CID Special Agent (SA) Douglas Hill.

Despite the grant of immunity, PVT Smoyer was hesitant to cooperate with the investigation. In his first interview following the immunity grant, on July 15, PVT Smoyer stated that he did not see any drugs and expressly denied that he had injected SPC Coffin. Investigators felt that PVT Smoyer "was not being completely truthful" with them when describing the events of April 5.

However, on July 22, there was a significant breakthrough in the case. Appellant made an immunized statement admitting that he brought back 15 "dime bags" of heroin when he returned from leave on April 4, and that he gave the drugs to PVT Smoyer, receiving $150 in return. Further, Appellant admitted that he used heroin with PVT Smoyer on five or six occasions between October and December 1997. Finally, Appellant admitted that, on April 4, he, PVT Smoyer, and SPC Coffin each snorted a line of heroin (approximately 1/3 of a "dime bag" each) and PVT Smoyer injected himself and SPC Coffin with heroin. Appellant also commented that he was concerned about SPC Coffin when he returned to his room early that morning.

On August 7, investigators then interviewed PVT Smoyer a second time, and he again denied culpability in SPC Coffin's death. He also denied he had any recollection that Appellant had brought drugs back from New York City. The CID team continually questioned the veracity of PVT Smoyer's statements.

On September 2, initial charges that did not include involuntary manslaughter were preferred against PVT Smoyer.

6

Following notification of the charges, PVT Smoyer spoke to his father, Dr. Ronald Smoyer, several times in the first week of September and admitted his culpability in the death of SPC Coffin.  Dr. Smoyer was concerned about whether his son would be honest and incriminate Appellant, so he urged PVT Smoyer to tell the truth.  However, PVT Smoyer did not confide in his legal counsel, and he did not admit his culpability to the Government.

On September 11, PVT Smoyer's defense team received a list of witnesses for his hearing pursuant to Article 32, UCMJ, 10 U.S.C. § 832 (2000).  Appellant was listed as a witness to testify against PVT Smoyer.  On September 15, the Government added a charge of involuntary manslaughter against PVT Smoyer.

On September 28, one day prior to his Article 32 hearing, PVT Smoyer contacted his counsel to indicate a willingness to cooperate and finally admit culpability.  PVT Smoyer's counsel did not make any record of his admission.

At PVT Smoyer's Article 32 hearing, on September 29, Appellant testified that he provided the heroin that PVT Smoyer injected into SPC Coffin on April 4.  The following day, PVT Smoyer provided an immunized statement to CID.  Contrary to his previous statements, PVT Smoyer admitted for the first time that he injected the heroin into the arm of SPC Coffin, that Appellant had provided the heroin, and that PVT Smoyer knew beforehand that Appellant was bringing heroin back from New York City.  PVT Smoyer also implicated Appellant in other drug offenses.

PVT Smoyer signed a plea agreement on October 2.  However, the prosecution team was not certain that he would carry through with his guilty plea and, therefore, investigative efforts

7

continued. On November 9, PVT Smoyer pleaded guilty under the pretrial agreement limiting his confinement to seven years.

### Pretrial Developments Relating to the Prosecution of Appellant

All the present charges including the manslaughter offense were preferred against Appellant on December 3. On December 10, the Article 32 investigating officer (IO) informed Appellant that PVT Smoyer would be a witness. When the investigation convened on January 19, 1999, PVT Smoyer was again identified as a scheduled witness. However, CID SA Michael Martinez was the only witness called at the Article 32 hearing. In this testimony, SA Martinez made repeated reference to statements of PVT Smoyer implicating Appellant in all the offenses. He acknowledged that he was relying on the statement of PVT Smoyer. PVT Smoyer never testified at the investigation because of possible future prosecution for perjury.

On June 3, Appellant entered into a pretrial agreement. Paragraph three of this agreement states, "The government expressly agrees to allow SPC Mapes to enter a conditional plea pursuant to Rule for Courts-Martial 910(a)(2) [hereinafter R.C.M.]. This conditional plea preserves SPC Mapes' right to appeal all adverse determinations resulting from pretrial motions."

### Trial Developments

Availing himself of this provision in the pretrial agreement, Appellant, prior to entering a guilty plea, moved to dismiss the charges or provide other appropriate relief. Appellant asserted that the Government used evidence derived from

Appellant's immunized statement to prosecute him in violation of the mandate in Kastigar v. United States, 406 U.S. 441 (1972) and a long line of cases of this Court that apply Kastigar. Appellant also asserted that the improper use of his immunized testimony tainted the decision to prosecute him. The prosecution rejected this position and attempted to establish no use, direct or indirect, of Appellant's immunized statements and testimony. It asserted compliance with Kastigar by proving there had been no compromise of the "Chinese wall" erected between the investigation and prosecution of Appellant and PVT Smoyer. In an extended evidentiary hearing, the parties developed the relevant facts to the Kastigar issue. For purposes of this appeal, we need not recapitulate all this evidence.

The cornerstone of the prosecution's case was the testimony of PVT Smoyer regarding his cooperation with the Government. Appearing in court as a sworn witness against the Appellant for the first time, PVT Smoyer asserted that Appellant's appearance as a witness against him had no impact on his decision to testify against Appellant. PVT Smoyer explained that he had made up his mind to "come clean" prior to his Article 32 hearing and to avail himself of the opportunity to enter into a pretrial agreement to minimize punishment. The defense challenged PVT Smoyer's assertions and alleged that Appellant's immunized statement implicating PVT Smoyer, and Appellant's identification and appearance as a witness at PVT Smoyer's Article 32 hearing triggered PVT Smoyer's belated cooperation with the prosecution.

A significant and important portion of the evidentiary hearing focused on the prosecution's attempt to bolster the

credibility of PVT Smoyer. However, PVT Smoyer responded in the affirmative when he was asked by the trial counsel, "After you received your grant of testimonial immunity, did you continue to lie to CID about your involvement in Specialist Coffin's death?" Furthermore, PVT Smoyer again answered affirmatively when Appellant's counsel questioned whether he lied on July 15 and August 7. PVT Smoyer agreed with Appellant's counsel that he "lied to [his attorney], and [he] lied to the government." The military judge made detailed findings of fact and conclusions of law that are at Appendix A of this opinion.

The military judge found that the decision to prosecute Appellant was not tainted by his immunized testimony and that the Government did not improperly use Appellant's immunized testimony in prosecuting him. The judge found that PVT Smoyer decided to testify against Appellant to get a more favorable pretrial agreement. The judge also found that PVT Smoyer had decided to "come clean" to the CID and testify against Appellant before he knew Appellant had implicated him in immunized statements and prior to Appellant testifying against him at his Article 32 hearing.

Lieutenant Colonel (LTC) Richard Hough was the original military judge who ruled on the defense motion to dismiss. However, almost two weeks after he denied the defense motion, the court reconvened with a new military judge, COL Keith H. Hodges. Appellant then pleaded guilty in accordance with the terms of his pretrial agreement.

A traditional providency inquiry followed. In addressing whether the pretrial agreement contained all the understandings

or agreements in this case, Judge Hodges initiated a detailed dialogue with the Appellant and both counsel regarding the pretrial agreement condition that permitted Appellant to enter a conditional guilty plea.  The record establishes it was the understanding of the parties that if an appellate court determined that the judge erroneously ruled on the motion, the Appellant could withdraw his plea of guilty.

Adopting the findings and reasoning of the military judge, the lower court also held that the Government met its burden to show no use of Appellant's immunized testimony and that the decision to prosecute Appellant was untainted by Appellant's immunized statements.

## DISCUSSION

In United States v. Manuel, this Court reaffirmed the fundamental principle that the Constitution each servicemember swears to defend affords to every servicemember Constitutional protections.  43 M.J. 282, 286 (C.A.A.F. 1995).  This Court stated:

> The administration of military justice is rooted in inherent fair play and justice that prevail under the Anglo-American system of law.  "[I]n defining the rights of military personnel, Congress was not limited to the minimum requirements established by the Constitution, and in many instances, it has provided safeguards unparalleled in the civilian sector." United States v. McGraner, 13 MJ 408, 414 (CMA 1982). See, e.g., Gilligan, The Bill of Rights and Service Members, The Army Lawyer 3 (Dec. 1987)(servicemembers' rights broader than constitutionally required).  The broad constitutional rights that servicemembers enjoy spring from the fundamental principle that they do not lay aside the citizen when they assume the soldier.
>
> > [M]embers of the military are not shorn of their constitutional rights while they remain in the military service.  Blackstone said: '. . . he puts not off the citizen when he enters the camp; but

11

> it is because he is a citizen, and would wish to
> continue so, that he makes himself for a while a
> soldier.'  [1 Blackstone, Commentaries (Wendell
> ed), page 408.]

> United States v. Culp, 14 USCMA 199, 206, 33 CMR 411,
> 418 (1963).

Id. at 286.

A servicemember's protection against compulsory self-incrimination is unparalleled in the civilian sector.  This fundamental right is protected by both the Fifth Amendment and Article 31, UCMJ, 10 U.S.C. § 831 (2000), which provides additional protection.

The Fifth Amendment's privilege against compulsory self-incrimination simply states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  We have stated that servicemembers enjoy the protection of this constitutional privilege.  United States v. Rosato, 3 C.M.A. 143, 145, 11 C.M.R. 143, 145 (1953)("Dispelling any doubt of its application to the military services, Congress included the substance of the Fifth Amendment in the Uniform Code of Military Justice, as Article 31[.]").  More recently, this Court reaffirmed this principle stating this general proposition: "[T]he protections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces."  United States v. Graf, 35 M.J. 450, 460 (C.M.A. 1992)(citations omitted).

Expanding on this fundamental constitutional protection, Article 31 requires that,

> [b]efore an individual accused or suspected of a crime
> under the Code is interrogated by a person subject to
> the Code, the suspect must be warned of the nature of

12

> the accusation, the right to remain silent and the
> consequences of foregoing that right, and the right to
> appointed counsel free of charge or civilian counsel at
> no expense to the government . . . . Miranda [v.
> Arizona, 384 U.S. 436 (1966)] does not apply until
> there is a custodial interrogation. The rights warning
> requirements in the military, however, is triggered
> earlier. When an individual is suspected of an
> offense, the warning must be given prior to
> questioning, even if the suspect is not in custody.

Francis A. Gilligan, The Bill of Rights and Servicemembers, 1987 Army Law. 3, 4 (Dec. 1987) (footnotes omitted).

A servicemember's right against self-incrimination, however, is neither absolute nor inviolate. "The power of government to compel persons to testify in court or before grand juries and other governmental agencies is firmly established in Anglo-American jurisprudence." Kastigar, 406 U.S. at 443 (footnote omitted). This is an essential and necessary governmental power reflecting the ancient legal maxim that the "public . . . has a right to every man's evidence." Jaffee v. Redmond, 518 U.S. 1, 9 (1996); United States v. Bryan, 339 U.S. 323, 331 (1950). This governmental power to compel testimony establishes a testimonial duty for every citizen.

The tension between the governmental power to compel testimony and a citizen's right to protection against self-incrimination is reconciled in immunity statutes. Immunity statutes are also "part of our constitutional fabric." Ullmann v. United States, 350 U.S. 422, 438 (1956). Early immunity statutes conferred on immunized witnesses a broad transactional immunity. Id. However, in 1970, Congress enacted the current federal immunity statutes authorizing use and derivative use immunity to preserve the balance between the citizen's privilege against compulsory self-incrimination and the Government's power

13

to compel testimony.  18 U.S.C. § 6002 (2000).  In Kastigar, the Supreme Court sanctioned this practice.

Title 18 U.S.C. § 6002, immunity generally, states in part:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
>
> > (1)  a court or grand jury of the United States,
> >
> > (2)  an agency of the United States, or
> >
> > (3)  either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee or either House.
>
> and the person presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

(Emphasis added.)

Consistent with this federal practice, a general court-martial convening authority may grant a servicemember immunity from the use of testimony, statements, or any other information derived directly or indirectly from such immunized testimony or statements in a subsequent court-martial.  See R.C.M. 704(a), (c).  After receiving such immunity, an immunized servicemember may be ordered to give a statement or to testify because the grant of immunity removes the right to refuse to cooperate on self-incrimination grounds.  See R.C.M. 704(d) discussion; Military Rule of Evidence 301(c).  Neither the testimony of an immunized soldier, nor any evidence derived from such testimony,

14

may be used against the immunized soldier at a subsequent trial, other than for perjury, false swearing, making a false official statement, or failure to comply with an order to testify.  See id.

Simply stated, an immunity statute permits the Government to compel a citizen to provide information but prevents governmental use of the information to prosecute the citizen.  The foundation principle in these statutes is that the scope of the grant of immunity must be coextensive with the scope of the privilege.  Murphy v. Waterfront Comm'n, 378 U.S. 52, 54 (1964). Essentially, this principle extracts a "quid pro quo" from the Government for the information it compels from the citizen.

The first aspect of this "quid pro quo" is that the Government may not use the information in any way to prosecute the citizen.  The second aspect is that the Government, if challenged in court, must demonstrate that it has followed a process to ensure it has not exploited the compelled information. Only when both aspects are satisfied does the Government honor a citizen's right to protection against self-incrimination and may use the compelled information.

The Supreme Court and this Court have vigilantly applied these principles.  The law relating to the use of immunized statements is well established.  In United States v. McGeeney, 44 M.J. 418, 422-23, this Court summarized the applicable law.

> In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that prosecutorial authorities may not use testimony compelled by a grant of immunity.  We have construed "use" to include non-evidentiary use such as the decision to prosecute.  See United States v. Olivero, 39 MJ 246, 249 (CMA 1994), citing United

15

States v. Kimble, 33 MJ 284 (CMA 1991). Other federal appellate courts have construed Kastigar to hold that the Government may not "alter its investigative strategy" based on immunized testimony. See United States v. Harris, 973 F.2d 333, 336 (4th Cir. 1992). Finally, the Government may not use the testimony of a witness which was influenced by the immunized testimony. United States v. North, 910 F.2d 843, 860 (D.C.Cir.) [North I], modified in part, 920 F.2d 940, 942 (1990) [North II].

Under Kastigar, the Government has a "heavy burden" to show non-use of immunized testimony. 406 U.S. at 461, 92 S.Ct. at 1665. The Government must do more than negate the taint; it must affirmatively prove that its evidence "is derived from a legitimate source wholly independent of the compelled testimony." An appellant is "not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." 406 U.S. at 460, 92 S.Ct. at 1665. See United States v. Boyd, 27 MJ 82, 85 (CMA 1988). Prosecution may proceed only "if the Government shows, by a preponderance of the evidence, that the . . . decision to prosecute was untainted by" immunized testimony. United States v. Olivero, 39 MJ at 249, quoting Cunningham v. Gilevich, 36 MJ 94, 102 (CMA 1992); see United States v. Harris, 973 F.2d at 336.

The question of whether the Government has shown, by a preponderance of the evidence, that it has based the accused's prosecution on sources independent of the immunized testimony is a preliminary question of fact. Id. at 423 (citing United States v. Rivera, 1 M.J. 107, 110 (C.M.A. 1975)). This Court will not overturn a military judge's resolution of that question unless it is clearly erroneous or is unsupported by the evidence. Id. (citing Samples v. Vest, 38 M.J. 482, 487 (C.M.A. 1994)).

As we have addressed this issue in many other cases, we have detailed guidance as to the factors to be considered in deciding whether the Government's evidence against Appellant was obtained from a source wholly independent of his immunized testimony. See United States v. England, 33 M.J. 37 (C.M.A. 1991); United States v. Gardner, 22 M.J. 28 (C.M.A. 1986). These factors include:

16

> 1. Did the accused's immunized statement reveal anything "which was not already known to the Government by virtue of [the accused's] own pretrial statement"?
>
> 2. Was the investigation against the accused completed prior to the immunized statement?
>
> 3. Had "the decision to prosecute" accused been made prior to the immunized statement? and,
>
> 4. Did the trial counsel who had been exposed to the immunized testimony participate in the prosecution?

England, 33 M.J. at 38-39.

Applying the foregoing principles and these factors, we hold that the court below erred in upholding the military judge's finding that the prosecution of Appellant was untainted. Here the prosecution failed to carry its "'heavy burden' to show non-use of immunized testimony." United States v. Youngman, 48 M.J. 123, 127 (C.A.A.F. 1998).

At the outset, we note that Appellant's immunized statement revealed important new information which was not already known to the Government. The critical question in the investigation was the degree of culpability of Appellant and PVT Smoyer. The prosecution did not know who, if anyone, provided the heroin and who, if anyone, injected SPC Coffin with it. Appellant's immunized testimony resolved the issue as Appellant implicated himself in providing the heroin and PVT Smoyer in injecting heroin into SPC Coffin.

The investigation against Appellant was not completed prior to his immunized statement. To the contrary, the chronology of events reveals that the investigation had reached an impasse, and command officials concluded the only way to make progress was to immunize both Appellant and PVT Smoyer. Although the military

17

officials asserted that the "decision to prosecute" Appellant was made prior to his immunized statement, charges against Appellant were neither preferred nor referred until months after both Appellant and PVT Smoyer were granted immunity and provided statements implicating themselves in all of the charged offenses.

The record demonstrates that the prosecution needed the immunized testimony of Appellant to obtain evidence to prove several of the charged offenses and the manslaughter offense in particular. While the Government desired to prosecute Appellant, they did not have the proof to go forward until they successfully used Appellant's immunized statement to prosecute PVT Smoyer and thereby obtained PVT Smoyer's immunized statement implicating Appellant. COL Graves, the SJA, confirmed this in both his written recommendation to grant immunity and his conversations with the convening authority about granting immunity. In the former, he stated that immunity was needed to establish the charges of distribution and involuntary manslaughter. As to the latter, he testified that in July 1998 he informed the convening authority, "one of the charges we wanted to pursue was manslaughter, and we didn't think we were going to get there without grants of immunity." His testimony belies any assertion by the prosecution that they could have or would have prosecuted either Appellant or PVT Smoyer for manslaughter without the use of Appellant's immunized testimony or independent of Appellant's cooperation. As in Rivera, we continue to give great weight to the statements of the SJA as to the necessity and purpose in seeking the grant of immunity.

We acknowledge that the Government made an attempt to avoid taint by constructing a "Chinese wall" between the two separate teams prosecuting Appellant and PVT Smoyer, thereby protecting the prosecutor of Appellant from direct exposure to his immunized testimony. However, the convening authority, the SJA, and the principal CID investigator were tainted by knowledge of the dual investigations. Attempts to establish a "Chinese wall" were ineffective to protect against compromise of the immunized testimony of both Appellant and PVT Smoyer.

Both the convening authority and SJA had access to Appellant's immunized testimony when they reviewed and acted upon PVT Smoyer's case. In addition, Appellant's immunized information was relied upon during a briefing related to PVT Smoyer's case in which there was discussion of the recommendations of the IO. Therefore, both the convening authority and the SJA were privy to Appellant's immunized statement when the decision was later made to prosecute him. Furthermore, SA Hill supervised both investigations. Knowing that Appellant had confessed, SA Hill ordered another special agent interviewing PVT Smoyer to "be aggressive." These circumstances demonstrate that the "Chinese wall" was ineffective in protecting Appellant's immunized testimony from being exploited by the command in resolving Appellant's case.

This Court has previously warned that "[p]recautions such as 'cataloguing' or 'freezing' the evidence known to the Government before taking the immunized testimony will help the Government carry its burden in a subsequent trial of the immunized witness; and before immunized testimony is given, all reasonable efforts

should be made by prosecution officials to memorialize what evidence is in their possession and what prosecutorial decisions have already been made." Gardner, 22 M.J. at 32. See e.g., Boyd, 27 M.J. at 85; Richard J. Link, Annotation, Effect of Defendant's Immunized Statements on Testimony by Prosecution Witness – Post-Kastigar Cases, 122 A.L.R. Fed. 429, 439-40 (1994). In the instant case, while Government witnesses testified that they believed there was an intent to prosecute Appellant, the Government made no attempt throughout the course of investigation to memorialize or record in writing the charges as they developed under the evidence of the case. The evidence to support the preferred charges was not properly preserved or memorialized. This deficiency weakened the foundation of the prosecution's "Chinese wall" argument.

The foregoing analysis leads to the most important aspect of this case: whether the prosecution influenced PVT Smoyer's decision to testify against Appellant by its improper use of Appellant's immunized testimony. Our concern is whether the prosecution induced an immunized Appellant to testify against PVT Smoyer, exploited this evidence to induce PVT Smoyer to provide immunized information implicating Appellant, and finally used PVT Smoyer's statement to prosecute Appellant. We explicitly condemned this exploitation of immunized testimony in Rivera, 1 M.J. at 110-11. Revisiting Rivera is instructive as the facts and legal issues are similar.

In Rivera, three men attempted a robbery of a sleeping victim in his barracks. One of the men shot the victim and the group fled. Rivera and several others were apprehended for the

crimes. The SJA recommended that the accused be granted testimonial immunity in an attempt to identify the perpetrator and the other people involved. After being granted this immunity, Rivera made an inculpatory statement implicating three friends, including PVT Eddie Solis, in the shooting. Rivera testified at the pretrial investigation of PVT Solis. Later, PVT Solis was a witness against Rivera at both the pretrial investigation and trial. This Court expressly rejected this tactic of inducing each witness to testify against the other. Id. In addition, this Court rejected the trial judge's reliance on the statements of trial counsel that the Government did not make derivative use of the accused's immunized testimony. Id. at 110.

In the present case, the trial judge overlooked and the lower court misapplied this authority. Regarding Kastigar issues, we have held "[t]he military judge's use of incorrect legal principles . . . constitute[s] an abuse of discretion." See Youngman, 48 M.J. at 128.

PVT Smoyer did not testify at Appellant's Article 32 hearing. However, the physical absence of PVT Smoyer as a witness is of no consequence since SA Martinez was the sole prosecution witness at the Article 32 hearing, and he expressly relied on PVT Smoyer's immunized statement as the factual basis for much of his testimony. The prosecution may not indirectly do what it may not do directly. In other words, if PVT Smoyer's testimony in person would have violated the Kastigar prohibition, then SA Martinez's reliance on PVT Smoyer's testimony during his

own testimony is an indirect use that is equally objectionable under the rule announced in Kastigar.

Piercing through the prosecution's indirect use of PVT Smoyer's testimony, we focus on the key issue in this case: Did the prosecution carry the heavy burden to establish that Appellant's immunized testimony did not trigger PVT Smoyer's immunized disclosures?

This Court has reasoned that the "state of mind and motivation for coming forward and making a statement against [A]ppellant were 'directly relevant' to determining whether those statements were 'directly or indirectly derived' from immunized testimony." Boyd, 27 M.J. at 86 (citing United States v. Kurzer, 534 F.2d 511, 517 (2d Cir. 1976), on remand, 422 F.Supp. 487, 489 (S.D.N.Y. 1976)). Furthermore, in Rivera, we rejected that the prosecution can satisfy its Kastigar burden with "mere representations on the part of the Government." 1 M.J. at 110. Where an immunized witness appears as a Government witness, the holding of Rivera requires more than the witness's representations of his state of mind and motives in making disclosures. The court must scrutinize the testimony of an immunized witness and be circumspect in accepting explanations for motives and state of mind in cooperation. See id.

Both the military judge and the lower court failed to adequately scrutinize the testimony of PVT Smoyer. Their failure to weigh PVT Smoyer's testimony against his conflicting statements resulted in their improperly assessing his explanation regarding the reason for his cooperation -- a desire to "come

clean" and to obtain a favorable pretrial agreement against the other evidence that the prosecution was tainted.

The Government claims that PVT Smoyer's immunized statements against Appellant on September 30 were a product of his own desire for a better sentence for himself and were unaffected by Appellant's July 22 immunized statement or immunized testimony at PVT Smoyer's Article 32 hearing. The military judge found as fact that PVT Smoyer provided an immunized statement against Appellant on September 30 to get the best sentencing deal for himself. We hold that this finding of fact is clearly erroneous as it is not supported by a preponderance of the evidence. See United States v. Hampton, 775 F.2d 1479 (11th Cir. 1985).

PVT Smoyer's conflicting and untruthful statements undermined his credibility. He admitted that prior to being granted immunity he had repeatedly lied about his involvement. After being granted immunity, he continued to lie. Although PVT Smoyer claimed he decided "finally to come clean" because of the pretrial agreement, he made inconsistent statements under that agreement. In a November 1998 interview, investigators believed that PVT Smoyer, after listening to Appellant's testimony during his Article 32 hearing, "started to confuse . . . what he overheard in the [hearing]" when recounting the facts for counsel. Finally, we observe that PVT Smoyer refused to testify at Appellant's court-martial and did so only after he was given transactional immunity. PVT Smoyer's repeated failure to cooperate with investigators contradicts PVT Smoyer's asserted motivation for cooperating.

PVT Smoyer's explanation for cooperation, a desire to "come clean," is not supported by the factual record. Prior to Appellant's immunized testimony at the Article 32 hearing, PVT Smoyer had neither entered into a pretrial agreement relating to his culpability nor made a statement implicating himself or Appellant. While PVT Smoyer asserted that he had decided the night before the Article 32 hearing to make a statement and to work out a plea bargain, he had done neither.

The chronology of events contradicts PVT Smoyer's explanation. There is little evidence that PVT Smoyer came to his conclusion to cooperate before the notice to him on September 11 that Appellant would be an immunized witness at his Article 32 hearing. PVT Smoyer had not accepted the SJA's open offer to make a deal from the time it was proposed in July until mid-September. As PVT Smoyer's conversation with his father occurred before he was charged with the most serious offense of involuntary manslaughter, his stated intention to cooperate is unsupported by this evidence. We note that Dr. Smoyer disclosed that PVT Smoyer had a history of lying, "a trait that was cultivated almost to an art form!" Furthermore, PVT Smoyer's defense counsel admitted that he had not told her the truth until

September 28.[1]  Finally, PVT Smoyer did not have a pretrial agreement.  If future satisfactory pretrial agreement terms could not be negotiated, PVT Smoyer was not committed to cooperation.  In these circumstances, PVT Smoyer's desire for a deal was equivocal and uncertain.

The timing of PVT Smoyer's first statement implicating Appellant in SPC Coffin's death strongly supports Appellant's argument that his statement was induced by Appellant's testimony.  PVT Smoyer implicated Appellant immediately after Appellant testified against him at the Article 32 hearing.  The next day, after hearing Appellant's testimony against him, PVT Smoyer did not hesitate or delay in implicating Appellant.

As the prosecution was built on PVT Smoyer's assertion of a desire to "come clean," it is also appropriate to consider other possible motives to explain the reason for his cooperation in the prosecution of Appellant.  Boyd, 27 M.J. at 85.  First, it is clear that PVT Smoyer was betrayed by Appellant's testimony that PVT Smoyer had injected SPC Coffin with heroin.  PVT Smoyer and

---

[1] After receiving transactional immunity, PVT Smoyer testified during Appellant's motion pursuant to Kastigar v. United States, 406 U.S. 441 (1972), stating that he told his defense counsel, CPT Bleam, the truth about his role in the death of SPC Coffin before his hearing pursuant to Article 32, Uniform Code of Military Justice, 10 U.S.C. § 832 (2000), and that "she wrote down everything [he] said."  Appellant's counsel then requested access to CPT Bleam's notes of PVT Smoyer's account.  The military judge ruled that PVT Smoyer's testimony waived his attorney-client privilege and called a recess so trial counsel could procure CPT Bleam's notes.  After discovering that there were no notes, Appellant's counsel called CPT Bleam as a witness.  Initially, CPT Bleam invoked attorney-client privilege and refused to answer defense counsel's questions.  However, after the military judge informed CPT Bleam that by testifying PVT Smoyer waived his right to confidentiality, she testified.

Appellant had agreed not to implicate each other, and PVT Smoyer had repeatedly lied to adhere to this agreement. Confronted with Appellant's testimony implicating him, PVT Smoyer was now free to implicate Appellant. Second, PVT Smoyer's culpability in SPC Coffin's death may have been a burden on his conscience. Not only did PVT Smoyer inject SPC Coffin with heroin, but PVT Smoyer also refused to render aid to a dying friend. We note that PVT Smoyer was specially trained as a certified combat lifesaver to provide emergency assistance. PVT Smoyer's cooperation in the prosecution of Appellant transferred some accountability for SPC Coffin's death to Appellant. Each of these other motives rendered PVT Smoyer's testimony suspect and invited careful scrutiny of it, because of the Government's heavy burden to demonstrate that PVT Smoyer's testimony was not "shaped, altered, or affected" by Appellant's immunized testimony. See North II, 920 F.2d at 943; North I, 910 F.2d at 861.

The Government failed to carry its heavy burden to show that it did not make use of Appellant's compelled statement and failed to affirmatively prove that its evidence was "derived from a legitimate source wholly independent of the compelled testimony." See Kastigar, 406 U.S. at 460. We also conclude that the decision to prosecute appellant was tainted.

Most importantly, the statements of the SJA regarding the reasons for granting immunity and the chronology of events of the investigation and prosecution reveal that the Government used Appellant's July 22 immunized statement to determine what charges should be lodged against each of the co-accused. Prior to that time, the Government had no direct evidence of the events on the

26

early morning of April 5, and it had not decided what crimes to charge against each suspect. This immunized information clearly impacted the Government's prosecutorial strategy, i.e., Appellant was the heroin provider and PVT Smoyer was the heroin injector. See Olivero, 39 M.J. at 249-50.

## REMEDY

The final question is the sanction for this Kastigar violation. As the Government has not carried the heavy burden to show it did not exploit Appellant's immunized testimony to induce PVT Smoyer's cooperation and incriminating disclosures, the impact of both Appellant's and PVT Smoyer's immunized testimony must be neutralized.

This requires the dismissal of any charges where the decision to prosecute was tainted by this evidence. For the reasons stated above, we hold that the decision to prosecute Appellant tainted all charged offenses related to the heroin overdose death of SPC Coffin on the early morning of April 5. Accordingly, Appellant's convictions of involuntary manslaughter, conspiracy, false official statement, and three drug offenses on April 5 (wrongful introduction, wrongful distribution, and heroin use) must be set aside and these charges and specifications dismissed.

Similarly the Government may not prosecute Appellant for drug offenses with PVT Smoyer relating to wrongful heroin use and distribution between 15 August 1996 and 31 March 1998 that are derivative of the immunized testimony. However we need not dismiss specifications (4) and (5) of Charge IV at this time, as the evidence related to these offenses may not be tainted. The

investigation into Appellant's drug abuse and offenses prior to the decision to grant both Appellant and PVT Smoyer immunity revealed evidence that may have been sufficient to sustain a prosecution untainted by the later immunized testimony. For example, PVT Wilson implicated Appellant in these offenses prior to both Appellant and PVT Smoyer being granted immunity.

While these are serious offenses, the record reflects that the "immunized statements caused or played a substantial role in referral of the remaining offenses against [Appellant] to a general court-martial." Youngman, 48 M.J. at 128. We therefore conclude that the appropriate remedy is the submission of the evidence relating to these two offenses to a new convening authority. We will accomplish this result by setting aside the Appellant's guilty plea to specifications (4) and (5) under Charge IV. This is the relief authorized by R.C.M. 910(a)(2)("if the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty.")[2]

---

[2] As noted above, the Appellant entered a conditional plea, preserving the right to litigate the Kastigar issue on appeal. Regarding confessional stipulations, we have observed,

> In Federal civilian practice it is inappropriate for a conditional guilty plea to be entered and accepted when the issue reserved for appeal will not be dispositive of an accused's case. See United States v. Wong Ching Hing, [867 F.2d 754, 758 (2nd Cir. 1989)]. See generally 18 USC (Rule 11(a)(2)) Federal Rule of Criminal Procedure, Notes of Advisory Committee on 1983 Amendment.

United States v. Maio, 34 M.J. 215, 219 n.3 (C.M.A. 1992).

R.C.M. 910(A)(2) does not similarly limit military practice, but the Analysis of the Military Rules of Evidence advises cautious use of the conditional plea when the decision on appeal will not dispose of the case. See Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A21-58-59. Drafters Analysis, MCM at A51-59. Where a

DECISION

The decision of the United States Army Court of Criminal Appeals is reversed.  The findings of guilty to Charges I, II, III, and their specifications; and specifications (1), (2), and (3) of Charge IV are dismissed.  The sentence is set aside.  The record of trial is returned to the Judge Advocate General of the Army for submission to a new convening authority for further action consistent with this opinion only with regard to specifications (4) and (5) of Charge IV.

---

conditional guilty plea is not case dispositive as to either the issue preserved for appeal or as to all of the charges in a case, the military judge should address as part of the providency inquiry the understanding of the accused and the parties as to the result of the accused prevailing on appeal.

In the present case, Judge Hodges appropriately initiated a discussion of this matter, but the record is inadequate.  We need not address issues that could arise from this dialogue as we have dismissed several of the charges and set aside Appellant's guilty plea as to the remaining offenses.

Appendix A

MJ:    Concerning the defense request for relief as set forth in their 9 April 1999 motion to dismiss, the court makes the following findings of fact and conclusions on the law as set forth below. The court notes that in determining these facts and rulings, the court has carefully considered the evidence presented during the motion hearing, critically scrutinized the testimony, demeanor, and sincerity of the witnesses who testified during this hearing, and painstakingly reviewed the positions of the parties and the cases argued by them in support of their positions.

The court adopts as fact all but the last sentence of the paragraph titled "STATEMENT OF THE CASE" from the prosecution's brief.

[STATEMENT OF THE CASE

On or about 5 April 1998, Specialist John Coffin died of a heroin overdose in his barracks room on Fort Carson.  The accused and PVT Ronald Smoyer eventually became suspects in SPC Coffin's death, and each received a grant of testimonial immunity from MG Riggs on or about 15 July 1998.  Charges were preferred against PVT Smoyer on 2 September 1998.  The Article 32 hearing in Smoyer's ease took place on 29 September - I October.  The accused testified in that hearing.  On 2 October 1998, PVT Smoyer submitted an offer to plead guilty that was approved by MG Riggs the same day. The Article 32 report was completed, signed, and submitted by the Investigating Officer on 7 October.  MG Riggs referred PVT Smoyer's case to a General Court-Martial on 14 October 1998, 12 days after having accepted Smoyer's offer to plead guilty.  PVT Smoyer's guilty plea occurred on 9 November 1998.  He is currently incarcerated at the United States Disciplinary Barracks.

Charges were preferred against the accused on 3 December 1998.  The Article 32 hearing took place on 19 January 1999. The Article 32 report was completed, signed, and submitted by the Investigating Officer on 3 February 1999.  MG Riggs referred the accused's case to a General Court-Martial on 11 February 1999.]

The court finds by a preponderance of the evidence that the following facts are true:

1. The decision to prosecute Specialist Mapes and Specialist [sic] Smoyer for offenses, including involuntary manslaughter, was made prior to the grants of immunity and creation of the Chinese wall.

2. No member of the prosecution team has seen any immunized statement made by Specialist Mapes.

30

3. No member of the CID team investigating Specialist Mapes has seen or heard any details about any immunized statement made by Specialist Mapes or any other evidence derived from any immunized statements made by Specialist Mapes.

4. The prosecution did not use Specialist Mapes' Article 32 testimony or any other immunized statement made by him in their decision to prosecute him, nor are they attempting to use any of his immunized statements or testimony against him at his trial.

5. Specialist Smoyer's immunized statements were not derived from Specialist Mapes' immunized testimony or statements.  They were wholly independent both as to content and purpose from Specialist Mapes' compelled immunized testimony.

6. The decision to prosecute Specialist Mapes was not in any manner based upon evidence derived from Specialist Mapes' compelled immunized testimony or statements.

7. When the staff judge advocate briefed the convening authority regarding Specialist Smoyer's offer to plead guilty and the referral of Specialist Smoyer's case to trial, he did not know what Specialist Mapes may have said in his immunized statements.  The staff judge advocate did not read the documents supporting the referral, nor did the convening authority.  The staff judge advocate did not advise the convening authority about any of Specialist Mapes' immunized statements.

8. The Chinese wall was not breached.  The plan for creation of separate investigations was well-conceived and carefully planned.  The investigators and prosecutors for both teams were thoroughly briefed about the special requirements of their separate investigations.  They understood that they could not share or request information from the other team, and they scrupulously adhered to that limitation.  The files were kept separately and not available to members of the other investigation or prosecution [sic] team.  Neither team disclosed information to members of the other team, and neither team obtained information from the other team.  More specifically, the team investigating Specialist Mapes did not receive any information about Specialist Mapes' immunized statements or any other evidence that may have been derived from that evidence.  Special Agent Hill made comments in the various investigative reports and the running logs in the investigation.  Specialist [sic] Hill's comments were purely administrative in nature and did not disclose to either team evidence found by the other team.  Moreover, the investigators understood that Special Agent Hill's comments were purely administrative and that his only role was to

ensure that the investigations were conducted in a timely manner and to ensure that operational requirements were achieved.

The court makes the following additionally -- makes the additional following specific findings:

1. The decision to prosecute.  This court finds by a preponderance of the evidence that prior to the offer of immunity and the creation of the Chinese wall, the prosecution had probable cause to and fully intended to charge and prosecute Specialist Mapes for offenses, including involuntary manslaughter, prior to the offer of immunity.  In other words, they had decided to charge Specialist Mapes with offenses, to include involuntary manslaughter.

The court also finds in this regard although the evidence known to the prosecution before immunity was neither formally cataloged or sealed, the evidence known as a result of the investigation to that point was maintained by CID in an original investigative file, Appellate Exhibit VI.

No charges were preferred against either Specialist Mapes or specialist Smoyer, nor were there any formal charging documents made, prior to the creation of the Chinese wall and prior to the grants of immunity. Nonetheless, it is clear by the independent evidence then known to the prosecution that Specialist Mapes and Specialist Smoyer were the primary suspects in the death of Specialist Coffin. It is also clear that based on what the prosecution had learned, that they had sufficient evidence to believe that Specialist Mapes had supplied the heroin and that Specialist Smoyer had injected the lethal dose of heroin into Specialist Coffin. It was also clear from what they knew that Specialist Coffin had died from a massive dose of heroin; that Specialist Coffin was seen in Specialist Mapes' room shortly before his death; that at the time, Specialist Coffin was wheezing and looked bad; that there was compelling evidence that both Specialist Smoyer and Specialist Mapes were in Mapes' room with Specialist Coffin shortly before Specialist Coffin's death; that Specialist Smoyer had obtained syringes shortly before Specialist Coffin's death; and that Specialist Mapes had brought back heroin from New Orle--from New York earlier in the evening before Specialist Coffin's death.  It was also known that Specialist Mapes and Specialist Smoyer had used drugs together, including heroin, previously and with other soldiers.  On one of those occasions, Private First Class Wilson used heroin supplied by the accused in the accused's room and was injected by Smoyer.

It was also clear that the prosecution had decided to prosecute Specialist Mapes as is evidenced by the decision

32

to grant simultaneous immunity to Specialist Mapes and Specialist Smoyer, the deliberate and carefully planned steps taken by the prosecution to erect the Chinese wall to ensure that both Specialist Mapes and Smoyer could be prosecuted, the care and detail with which all parties were briefed regarding the unusual nature of the investigation and the special requirements with which they were to conduct the separate investigations, the precision with which each investigation was conducted, and in particular the absolute requirement that in no instance could information be shared with anyone outside of their separate investigative team. Other indicators that the prosecution had decided to prosecute Specialist Mapes include the opinion rendered to CID that probable cause existed to title Specialist Mapes for offenses, including manslaughter--involuntary manslaughter--and the government decision to extend Specialist Mapes on active duty so that they could prosecute--so that he could be prosecuted. This court is convinced that regardless of whatever evidence was subsequently discovered by the separate investigations, the decision had been made to prosecute Specialist Mapes for offenses, including involuntary manslaughter.

2. Statements of Specialist Smoyer. This court finds by a preponderance of the evidence that Specialist Smoyer's immunized statement and any other subsequent statements were not derived from Specialist Mapes' immunized testimony or other immunized statements. The court also finds by a preponderance of the evidence that given the state of the evidence, Specialist Mapes' immunized statements played no role in Specialist Smoyer's decision to provide statements. Specialist Smoyer's statements were wholly independent, both as to content and purpose, from Specialist Mapes' compelled immunized testimony. Specialist Smoyer's sole purpose in coming clean with his attorney, in directing her to contact CID so that he could make a statement to CID, and for providing a statement incriminating himself and Specialist Mapes was to cut his losses by obtaining a favorable pretrial agreement.

In reaching this conclusion, the court carefully considered the testimony and demeanor of Specialist Smoyers [sic] as well as the other witnesses who testified on this issue and finds the following evidence persuasive as to Specialist Smoyer's motivation in presenting his statement to CID when he did. Specialist Smoyer testified that his reason for cooperating with CID; that is, coming--I'm sorry. His reason for cooperating with CID, for coming clean with his father, for telling the truth to his lawyer and directing her to arrange a meeting with CID so that he could provide CID a statement, and for giving the statement incriminating himself and Specialist Mapes was his desire to cut his losses by obtaining a favorable pretrial agreement. He thought he--he knew that he had to admit his involvement in the incident and tell CID the whole truth in order to get

33

the favorable agreement.  His decision to come clean with CID was made before the Article 32 investigation, as is evidenced by his discussions with his father, his lawyer-- and his lawyer.  The decision was not made in anticipation of Specialist Mapes' testimony but, rather, to secure the favorable pretrial agreement. In his statement, Specialist Mapes unequivocally--I'm sorry; Specialist Smoyer unequivocally and clearly admitted that he was the one who injected the lethal dose of heroin into Coffin, which is clearly a more culpable role in the death of Coffin than providing heroin.

The court also finds that under the circumstances of this case, the contents of the statement provided by Specialist Smoyer, although very similar to the details provided by Specialist Mapes, were not derived from Specialist Mapes' Article 32 testimony.  The court finds by a preponderance of the evidence that the details provided by Specialist Smoyer in his statement were facts he remembered because of his presence and active involvement in the death of Specialist Coffin in Specialist Mapes' room.  His memory of these facts was independent of and in no way influenced by the details provided by Specialist Mapes in the Article 32 investigation and completely independent of Specialist Mapes' Article 32 testimony.  His statement is totally supported and corroborated by the independent evidence known to the prosecution prior to the extension of immunity and the creation of the Chinese wall.  Again, it should be noted that Specialist Smoyer admitted to being the injector, which, in the court's view, is a more culpable role in the death of Specialist Coffin.

Specialist Smoyer's statement is independently supported by the other evidence presented on the issue. Specialist Smoyer and Specialist Mapes were close friends. Prior to the grants of immunity and the creation of the Chinese wall, they agreed that when questioned by law enforcement investigators, they would deny involvement and that they would protect themselves and each other by not providing statements against each other.  Both knew the extent of the other's involvement in the death and that at anytime, either one could incriminate the other.  This is evidenced by their statements prior to immunity denying involvement.  Specialist Smoyer's false statements to CID after the grant of immunity are completely consistent with this agreement.

Shortly after Specialist Smoyer learned that charges had been preferred against him, he participated in at least three telephone calls with his father.  In those phone calls, he told his father about the offenses, advised him about his fear of the possibility of lengthy confinement, and discussed the pretrial agreement with his father, ultimately telling his father that he wanted to take the pretrial agreement.

34

On Friday, the 11th of September, Specialist Smoyer received notice of his Article 32 investigation and a list of witnesses, including Specialist Mapes.  The first opportunity for Smoyer to talk with Captain Bleam about the pretrial agreement was not until Monday, the 28th of September, which was the day before the Article 32.  Captain Bleam was out of the office TDY, out of the area and unavailable to Specialist Smoyer, until Monday, the 28th of September, which was the day before the Article 32 investigation.  Specialist Smoyer was not aware of whether Specialist Mapes had been incriminating--had made incriminating statements against him before he received the Article 32 investigation notice.  Even after having received the Article 32 investigation notice, he still did not know for sure whether Specialist Mapes would actually testify against him at the investigation or, if he did, whether he would incriminate him.

CRAWFORD, Chief Judge (dissenting):

There are two very basic reasons to affirm in this case. First, there was substantial independent evidence to establish probable cause for the preferral of charges against Appellant before immunity was ever granted. Second, Private (PVT) Smoyer's decision to testify was made of his own free will, thus attenuating any connection with Appellant's immunized statement. In essence, the majority overlooks the independent evidence establishing probable cause to apprehend both PVT Smoyer and Appellant, and holds that false statements made pursuant to a grant of immunity taint truthful, voluntary testimony.

## FACTS

Appellant entered a conditional plea of guilty to involuntary manslaughter involving the heroin overdose of a fellow soldier, Specialist (SPC) Coffin. Prior to his pleas, Appellant moved to dismiss the charges on the grounds that the Government violated his Fifth Amendment right against self-incrimination by using his pretrial immunized statement, implicating himself and PVT Smoyer to induce PVT Smoyer to provide immunized testimony implicating Appellant.

On the morning of April 5, 1998, SPC Coffin was pronounced dead from a massive overdose of heroin. Immediately after his death, the Criminal Investigation Command (CID) began investigating the cause of death. CID special agents conducted

canvas interviews of the soldiers in the barracks, and uncovered circumstantial evidence pointing to the involvement of Appellant and PVT Smoyer. However, Appellant and PVT Smoyer agreed not to reveal any relevant facts to investigators in hopes of avoiding prosecution. Both Appellant and PVT Smoyer denied any involvement or knowledge of SPC Coffin's death.

The special agents learned from PVT Wilson on April 8 that Appellant was returning home from leave in New York City and had planned to bring drugs back with him. PVT Wilson admitted that he had previously used heroin with Appellant and PVT Smoyer in November 1997. On that occasion, Appellant provided the heroin and PVT Smoyer injected PVT Wilson. PVT Wilson told CID that he suspected that SPC Coffin had been killed by overdosing on heroin supplied by Appellant and injected by PVT Smoyer. Later, a physical examination of Appellant revealed he had several puncture wounds in both arms consistent with hypodermic needle marks.

PVT Wilson also told the investigators that Appellant used heroin regularly, and that SPC Coffin picked up Appellant at the airport on the day of his death. PVT Wilson stated that he had seen SPC Coffin in Appellant's room appearing high. Moreover, on the same date, CID interviewed PVT Smoyer, and he admitted using heroin with Appellant and PVT Wilson on several occasions.

2

PVT Wilson's information was corroborated on April 9 by PVT Aaron Carter, who told investigators that he saw SPC Coffin, Appellant, and PVT Smoyer in Appellant's room on April 5, and that he believed Appellant supplied SPC Coffin with heroin. PVT Carter also admitted that he knew PVT Smoyer had purchased hypodermic needles on the evening of April 4.  After SPC Coffin's death, PVT Carter asked Appellant if SPC Coffin used heroin, and Appellant answered that he did not know, but that if he did use heroin, "it was only a little bit."  Based on this information, the Government decided to pursue charges against both Appellant and PVT Smoyer.

## Discussion

The Supreme Court first applied the exclusionary rule to derivative evidence in Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920).  In extending the exclusionary rule to derivative evidence, the Court stated that if knowledge of facts or evidence is "gained from an independent source they may be proved like any others."  Id. at 392.  Nevertheless, it is not enough to show a causal connection between the original evidence and the derivative evidence, because as "a matter of good sense . . . such connection may have become so attenuated as to dissipate the taint."  Nardone v. United States, 308 U.S. 338, 341 (1939).

Both the independent source and attenuation doctrines apply to this case.  There was independent evidence yielding probable cause for the preferral of Appellant's charges.  Moreover, PVT Smoyer's testimony was sufficiently attenuated to permit its use against Appellant.

A.  Independent Source of Probable Cause for Preferral.

Preferral of charges occurs when a commander swears that he either investigated or has personal knowledge of the facts set forth in the charges, "and that they are true in fact to the best of that person's knowledge and belief."  Rule for Courts-Martial 307(b)(2).  Although neither the Manual for Courts-Martial, United States (2002 ed.) nor Article 30, Uniform Code of Military Justice, 10 U.S.C. § 830 (2000), specifically provides that the standard for preferral is probable cause, this Court has held that probable cause is required when an individual swears the charges are true to the best of his knowledge and belief.  See, e.g., United States v. Miller, 33 M.J. 235, 237 (C.M.A. 1991).

An application of hornbook law establishes that there was probable cause to prefer charges against Appellant.  The facts here are similar to the following factual scenario in the Restatement of Torts, 2d section 119, illustration 2 (1965): Officer A sees B and C bending over a dead man, D; B and C each accuses the other of murdering D.  Although A is not sure that

4

either B or C killed D, he has reasonable grounds to believe that one of them is the killer.  Thus, Officer A is permitted to arrest either.  In this vein, this Court has held that the furnishing of a drug which causes an overdose places the responsibility on the supplier -- in this case, Appellant.  United States v. Henderson, 23 M.J. 77 (C.M.A. 1986); United States v. Mazur, 8 M.J. 513 (A.C.M.R. 1979), aff'd 13 M.J. 143 (C.M.A. 1982).

Applying this law to the case at hand, there is probable cause to believe that the heroin supplier -- Appellant -- was responsible for the death.  Thus, setting aside the voluntary decision of PVT Smoyer to testify pursuant to a grant of immunity -- a decision made long after Appellant's false statement -- the evidence known at the time of preferral furnished an independent basis for the charges in this case.  Officers were permitted to arrest either Appellant or PVT Smoyer, both of whom were in the room at the time of SPC Coffin's death.

Moreover, independent evidence was obtained as a result of a police investigation.  A witness was not discovered after Appellant's immunized statement, like in United States v. Ceccolini, 435 U.S. 268 (1978).  To the contrary, PVT Smoyer's identity, his role, and Appellant's role were known well before PVT Smoyer's immunized testimony.  When such identity is known,

5

a court should be reluctant to hold the witness's testimony tainted by the accused's prior immunized statement, given the fact that witnesses, unlike tangible evidence, can make themselves known to the police. PVT Smoyer made a voluntary decision to testify based on what he knew were the facts, his interaction with his father, and personal reflection. There was no exploitation of an illegality. His voluntary plea, pursuant to a pretrial agreement, was enough to sever any taint from Appellant's immunized statement.

B.  Sufficiently Attenuated Testimony.

In addition to the independent evidence available to establish probable cause to prefer the charges, PVT Smoyer's testimony was "sufficiently attenuated" to permit its use against Appellant. United States v. Leon, 468 U.S. 897, 911 (1984). As to the attenuation rules, we should examine Supreme Court practice, which is reflected in Military Rule of Evidence 301(b)(1) and 304(e)(3). Applying the Court's mandate in Nardone, 308 U.S. at 341, PVT Smoyer's testimony was admissible if it had "become so attenuated as to dissipate the taint" from Appellant's immunized statement.

The correct test is "whether, granting establishment of the [immunized statement], the evidence to which [the] instant objection is made has been come at by exploitation of that [immunized statement] or instead by means sufficiently

6

distinguishable to be purged of the [immunized statement]."
Wong Sun v. United States, 371 U.S. 471, 488 (1963)(citation
omitted). See also New York v. Harris, 495 U.S. 14, 17
(1990)("'[W]e have declined to adopt a "per se or 'but for'
rule" that would make inadmissible any evidence, whether
tangible or live-witness testimony, which somehow came to light
through a chain of causation that began with [the granting of
immunity].'")(quoting Ceccolini, 435 U.S. at 276). In Leon, 468
U.S. at 911, the Court stated: "We also have held that a
witness' testimony may be admitted even when his identity was
discovered in an unconstitutional search." The Court recognized
that the evidence may be "sufficiently attenuated to permit the
use of that evidence at trial . . . ." Id.

Moreover, there is no bright line rule to determine if
evidence is sufficiently attenuated to be admissible. The Court
examines several factors that either support or negate
attenuation: temporal proximity, length of the causal chain,
acts of free will, flagrancy of a violation, and the nature of
the derivative evidence. Brown v. Illinois, 422 U.S. 590
(1975).

In Appellant's case, there are key dates and facts which,
taken together, show PVT Smoyer's plea was not the result of
Appellant's immunized statement. PVT Smoyer's decision to
testify was not made immediately after Appellant's immunized

7

statement, and the judge found that there was a break between the immunized statement and his decision, which was an act of free will. Furthermore, there is no argument as to intentional or reckless misconduct by governmental officers in obtaining the immunized testimony.

As of April 9, the Government had enough information to convict both PVT Smoyer and Appellant. If one looks at the guilty plea and the stipulation in this case, both signed prior to the motion to dismiss, all the evidence obtained as part of the guilty plea and the providence inquiry was known by the police by April 9, and the preferral of charges against PVT Smoyer and his decision to testify against Appellant were not related to Appellant's immunized statement. When all the factors in Brown are considered, this Court should find that there was sufficient attenuation in this case to allow Appellant's plea to stand.

Lastly, and most importantly, the nature of the derivative evidence -- testimony by a willing witness -- severs any connection with Appellant's immunized statement.

For all of these reasons, I respectfully dissent.