IN THE CASE OF


UNITED STATES, Appellee

v.

Carson L. ALLEN, Staff Sergeant
U.S. Marine Corps, Appellant

No. 03-0691

Crim. App. No. 9800849

United States Court of Appeals for the Armed Forces

Argued March 16, 2004

Decided May 27, 2004


    EFFRON, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, BAKER, and ERDMANN, JJ., joined.


Counsel

For Appellant:  Captain Rolando R. Sanchez, USMC (argued);
    Lieutenant Commander Robert D. Evans Jr., JAGC, USNR, and
    Lieutenant Commander Eric J. McDonald, JAGC, USN.


For Appellee:  Lieutenant Timothy E. Curley, JAGC, USNR
    (argued); Lieutenant Frank L. Gatto, JAGC, USNR (on brief);
    Colonel M. E. Finnie, USMC.



Military Judge:  W. P. Hollerich


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

United States v. Allen, No. 03-0691/MC

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer and enlisted members, Appellant was convicted, contrary to his pleas, of maiming and assault with intent to commit grievous bodily harm, in violation of Articles 124 and 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 924 and 928 (2000). He was sentenced to a bad-conduct discharge, confinement for 12 months, forfeiture of all pay and allowances, and reduction to pay grade E-1. The convening authority approved the sentence as adjudged, but deferred and suspended both the adjudged and automatic forfeitures under specified conditions. The Navy-Marine Corps Court of Criminal Appeals determined that the findings were multiplicious, dismissed the assault conviction, approved the conviction for maiming, and approved the sentence. United States v. Allen, 59 M.J. 515 (N-M. Ct. Crim. App. 2003).

On Appellant's petition, we granted review of the following issues:

> I.   WHETHER THE COURT OF CRIMINAL APPEALS
>      ERRED IN AFFIRMING THE COURT-MARTIAL'S
>      DECISION ADMITTING A STATEMENT DERIVED
>      FROM OTHER STATEMENTS COVERED BY A
>      GRANT OF IMMUNITY.
>
> II.  WHETHER THE DECISION TO PROSECUTE WAS
>      BASED ON STATEMENTS APPELLANT MADE
>      UNDER A GRANT OF IMMUNITY.

For the reasons discussed below, we affirm.

2

## I. BACKGROUND

At the time of the events at issue in this appeal, Appellant was a staff sergeant (SSgt) in the Marine Corps, stationed in Hawaii. The findings of the court-martial were based on injuries sustained by CJ, Appellant's infant son.

### A. THE INITIAL INJURY AND STATE COURT PROCEEDINGS

In late February and early March, 1996, Appellant's wife and CJ traveled to Baltimore, Maryland, while Appellant remained in Hawaii. They returned to Hawaii on March 6. Later that evening, Appellant and his wife brought CJ, who was then three months old, to Kapiolani Medical Center in Hawaii. CJ was transferred to Tripler Army Medical Center where he was treated for injuries consistent with Shaken Baby Syndrome. Medical personnel estimated that the injury probably occurred during the period in which Appellant's wife and CJ were in Baltimore and Appellant was in Hawaii.

The Naval Criminal Investigative Service (NCIS) opened an investigation into the incident. Based upon the initial medical examination, NCIS viewed Appellant's wife as the source of the injury, and did not maintain an active investigation of Appellant.

As a result of this incident, the Hawaii Department of Human Services placed CJ in foster care and initiated civil proceedings in Family Court under Hawaii's Child Protective Act,

3

Haw. Rev. Stat. § 587-1 (2003).  The court issued an order on April 8 limiting Appellant's wife to supervised contact with CJ. The order also provided that Appellant would regain custody of CJ, subject to a number of conditions.  These conditions included a requirement that Appellant's wife "secure[] a separate residence from [Appellant]," and that both Appellant and his wife participate "in therapy services, including parenting education, with Geraldine Wong, M.A."

The April 8 order also stated that "[t]he protections of [Haw. Rev. Stat.] § 587-42(a) are invoked on behalf of Mr. and Mrs. Allen."  Under § 587-42(a),

> [a]ny testimony by or other evidence produced by a party in a child protective proceeding under this chapter, which would otherwise be unavailable, may be ordered by the court to be inadmissible as evidence in any other state civil or criminal action or proceeding, if the court deems such an order to be in the best interests of the child.

Appellant subsequently regained custody of CJ.  Following a hearing on May 7, the Family Court issued a further order, attaching a service plan prepared by the Department of Human Services and agreed to by Appellant and his wife.  The service plan provided that Appellant's wife would participate in "individual/family therapy with Gerry Wong," that Appellant would provide for the daily care of CJ, and that Appellant would "attend therapy with Gerry Wong, M.A. when requested by Ms.

4

Wong." The order stated that "all prior consistent orders shall remain in full force and effect until further order," and directed the parties to return to court for a review hearing on November 1, 1996.

### B. THE SECOND INJURY

On August 8, CJ was hospitalized with serious injuries, including a fractured skull and swelling of the brain. Appellant explained to medical personnel that on the morning of August 8, he had been carrying CJ in his arms when CJ arched his back and fell onto the concrete floor. At that time, CJ was eight months old, and Appellant was the sole custodian. The most recent visit of Appellant's wife to the family had been on August 7.

While both Appellant and his wife were at the hospital, they were approached by an NCIS agent. After consulting with an attorney, they told the agent that they would not answer her questions, but they would permit the agent to monitor their conversations with the doctors and social workers at the hospital.

The hospital convened a Suspected Child Abuse and Neglect meeting on August 14. Appellant's supervisor, Colonel Charles Jackson, and NCIS Special Agent (SA) Bruce Warshawsky, attended the meeting. The medical personnel who treated CJ stated that the injuries were likely the result of non-accidental trauma,

5

and were not consistent with Appellant's explanation that CJ had fallen from his arms by accident. Appellant and his wife then joined the meeting, and they were advised that CJ's injuries were consistent with Shaken Baby Syndrome.

Following the meeting, Colonel Jackson had a further conversation with Appellant, and told him that the medical personnel suspected that he had injured CJ by shaking him in an abusive manner. As the discussion came to an end, Colonel Jackson said to Appellant, "If your son dies, I believe they are going to prosecute you for murder." According to Colonel Jackson, Appellant was visibly upset as a result of this conversation.

## C. THE INCRIMINATING STATEMENTS

On the evening of August 15, Appellant and his wife attended a family counseling session with Ms. Wong pursuant to the service plan attached to the Family Court's May 7 order. Appellant told Ms. Wong of the following sequence of events concerning CJ. First, he placed CJ in bed with him, and fell asleep. While sleeping, he dreamed that CJ had been taken from him. When he awoke, he forgot that CJ was in the same bed. Appellant went to check CJ's crib, discovered that the crib was empty, and panicked. Then he heard CJ cry. Appellant returned to the bed, grabbed CJ, and shook him.

6

Appellant's wife became upset upon hearing Appellant's narrative. Ms. Wong phoned a friend of Appellant's wife, Carol Ward, who came to Ms. Wong's office and eventually drove Appellant's wife to the Ward residence. Before leaving, Appellant's wife advised Ms. Wong to call Appellant's friend, SSgt Samuel Walker, to assist Appellant.

At Ms. Wong's request, SSgt Walker came to the office. Appellant, who spoke privately to SSgt Walker, told SSgt Walker that he had caused CJ's injuries, and demonstrated how he had shaken CJ. Appellant told SSgt Walker that he wanted to turn himself in to NCIS. SSgt Walker asked Appellant if he would prefer to wait until the following morning before turning himself in to NCIS. Appellant indicated that he wanted to surrender himself that night. Appellant and SSgt Walker then returned to Ms. Wong's office.

At that point, Ms. Wong contacted an official of the Hawaii Child Protective Services, Ms. Kathleen Reeber, and told her that Appellant had confessed. Ms. Reeber, who spoke with Appellant by telephone, advised him that anything he said to her would not be treated as confidential. She also suggested that he might wish to consult with an attorney before speaking with NCIS. While Appellant was on the phone with Ms. Reeber, SSgt Walker pressed the mute button and told him that he should not speak to a Child Protective Services official until he obtained

"some more advice." Appellant rejected SSgt Walker's suggestion, stating that "everything [was] all right." In the course of his subsequent conversation with Ms. Reeber, Appellant made a number of incriminating statements.

While Appellant was speaking to Ms. Reeber, SSgt Walker attempted to contact his chain of command. SSgt Walker reached his commander's wife, who called Appellant's commander, Colonel Jackson. Colonel Jackson, who was concerned that Appellant might harm himself, proceeded to Ms. Wong's office. SSgt Walker intercepted Colonel Jackson before he met with Appellant, and informed him that Appellant wanted to surrender to NCIS. Colonel Jackson then overheard a portion of Appellant's conversation with Ms. Wong. After walking into Ms. Wong's office, Colonel Jackson observed that Appellant appeared to be "shell-shocked" and "emotional." Appellant told Colonel Jackson that it was all part of a bad dream. When Colonel Jackson commented to Appellant that he "was going to go freely and turn himself in or I was going to call the [Military Police]," Appellant responded, "[Y]ou don't have to do that, I know I did this, and that I am not trying to deny it."

Appellant told Colonel Jackson that he wanted to speak with his wife before going to NCIS. Colonel Jackson, along with SSgt Walker, drove Appellant to meet with his wife. During the drive, Appellant repeated the incriminating remarks that he had

8

made earlier in the evening to Ms. Wong, Ms. Reeber, and SSgt Walker. Soon after they arrived, a chaplain also arrived, along with the wife of SSgt Walker's commanding officer. Appellant repeated his incriminating remarks to them, and demonstrated how he had shaken CJ.

Eventually, Colonel Jackson and SSgt Walker drove Appellant to the NCIS office, where Colonel Jackson told SA Warshawsky that Appellant wanted to confess. SA Warshawsky took Appellant into an interview room and administered a cleansing warning, which informed Appellant that "any prior illegal admissions or other improperly obtained evidence which incriminated [him could not] be used against [him] in a trial by court-martial." SA Warshawsky also advised Appellant of his self-incrimination rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b)(2000), and Miranda v. Arizona, 384 U.S. 436 (1966). See Military Rule of Evidence 305 [hereinafter M.R.E.]. Appellant indicated that he understood both the cleansing warning and his right against self-incrimination, and that he still desired to speak to NCIS. He then made a detailed incriminating statement.

D.    DEVELOPMENTS AT TRIAL

At a pretrial hearing, Appellant moved to suppress the multiple statements that he made on the evening of August 15, 1996, citing among other protections, the privilege against self-incrimination in the Fifth Amendment and Article 31. He

contended that his statements to Ms. Wong did not constitute a voluntary waiver of the privilege because he was compelled to speak to her as a result of the order issued by the Family Court, and that the other statements were derived from his admissions to Ms. Wong.  The military judge determined that the state statute referenced in the Family Court order provided Appellant with immunity for any statements that he made to Ms. Wong, as well as any derivative statements.  Based on that determination, the military judge suppressed Appellant's statements to Ms. Wong, SSgt Walker, Ms. Reeber, Colonel Jackson, and the chaplain, but concluded that the statement made at the NCIS office following the cleansing warning by SA Warshawsky was not tainted.  At trial, Appellant's statement to SA Warshawsky was a key aspect of the prosecution's evidence that resulted in Appellant's conviction.

## II. DISCUSSION

### A. IMMUNITY

The Government may not compel a person to make an incriminating statement.  U.S. Const. amend. V; Article 31, UCMJ; M.R.E. 301.  Through a grant of immunity coextensive with the privilege against self-incrimination, the Government may require a person to make a statement that would otherwise be

incriminating.  Kastigar v. United States, 406 U.S. 441 (1972).

As noted in M.R.E. 301(c)(1):

> The minimum grant of immunity adequate to
> overcome the privilege is that which under
> [Rule for Courts-Martial] 704 or other
> proper authority provides that neither the
> testimony of the witness nor any evidence
> obtained from that testimony may be used
> against the witness at any subsequent trial
> other than in a prosecution for perjury,
> false swearing, the making of a false
> official statement, or failure to comply
> with an order to testify after the military
> judge has ruled that the privilege may not
> be asserted by reason of immunity.

If a person provides information under a grant of immunity,

the Government in a subsequent criminal prosecution must

affirmatively demonstrate "that the evidence it proposes to use

is derived from a legitimate source wholly independent of the

compelled testimony."  Kastigar, 406 U.S. at 460.  See United

States v. Boyd, 27 M.J. 82, 84 (C.M.A. 1988).  A grant of

immunity by one jurisdiction within the federal structure, such

as a State, provides equivalent protections against use of the

information by other jurisdictions, such as another State or the

Federal Government.  See Murphy v. Waterfront Comm'n of New

York, 378 U.S. 52, 79 (1964).

The underlying principle furthered by a grant of

testimonial immunity is that the witness and the Government

should be left "in substantially the same position as if the

witness had claimed [the] privilege [against self-

incrimination]." Id. See Boyd, 27 M.J. at 84. We have recently described this principle as "extract[ing] a 'quid pro quo' from the Government for the information it compels from the citizen." United States v. Mapes, 59 M.J. 60, 67 (C.A.A.F. 2003). In addition to requiring that the Government abstain from using the compelled information in any way to prosecute the citizen, this "quid pro quo" also requires that "the Government, if challenged in court, demonstrate that it has followed a process to ensure it has not exploited the compelled information." Id.

The Government may not rely upon or use immunized testimony in making the decision to prosecute. See United States v. Olivero, 39 M.J. 246, 249 (C.M.A. 1994); United States v. Kimble, 33 M.J. 284 (C.M.A. 1991). The burden is upon the Government in such a case to demonstrate "by a preponderance of the evidence, that the prosecutorial decision was untainted by the immunized testimony." Olivero, 39 M.J. at 249. See Mapes, 59 M.J. at 67.

As noted in Part I, the military judge in the present case determined that Appellant's statements to Ms. Wong were made pursuant to a grant of immunity under state law. See Haw. Rev. Stat. § 587-42(a). The parties in this appeal have not identified an opinion by the Hawaii state courts that reaches a conclusion as to whether the statute provides a grant of

12

immunity.  For purposes of this appeal, we shall assume without deciding that the military judge correctly interpreted the Family Court order and the state statute as providing a grant of testimonial immunity to Appellant.

## B.  THE MOTION TO SUPPRESS

Under Kastigar, the Government must demonstrate that Appellant's incriminating statement to NCIS was "derived from a legitimate source wholly independent of" his earlier inculpatory statement to Ms. Wong.  406 U.S. at 460.  The record in the present case demonstrates that Appellant's statement was the product of his own desire to confess, and was not derived by the Government from his earlier statement to Ms. Wong.

The idea of confessing to NCIS on August 15 originated with Appellant, and he steadfastly resisted the advice of others who urged him to defer making a statement to NCIS.  SSgt Walker, who heard Appellant's confession shortly after he arrived at Ms. Wong's office, asked Appellant if he would not rather wait to speak with NCIS until the following morning, but Appellant insisted that he do so that evening.  Ms. Reeber, the Child Protective Services official who spoke to Appellant that night, told Appellant that he should consult with his attorney before speaking to NCIS.  Appellant did not take her advice.  SSgt Walker, upon learning that Appellant was speaking with a Child Protective Services official, interrupted Appellant's

13

conversation to advise him to remain silent. Again, he rejected that advice.

The record further demonstrates that Colonel Jackson, who came to Ms. Wong's office to protect Appellant from harming himself, was told upon arrival by Appellant's friend, SSgt Walker, that Appellant wanted to make a statement to NCIS. Appellant expressed no reluctance to Colonel Jackson about turning himself in to NCIS. When Colonel Jackson remarked that he would call the police if Appellant did not go freely, Appellant said "[Y]ou don't have to do that, I know I did this, and that I am not trying to deny it." Under other circumstances, a statement similar to Colonel Jackson's remarks might be problematic in terms of assessing the derivative nature of any subsequent statement. In the present case, however, there is no evidence of record that Colonel Jackson's remarks prompted Appellant to make a statement that he otherwise did not want to make or that it was used to overcome any reluctance manifested by Appellant. On the contrary, Appellant repeatedly insisted to both friends and officials that he wanted to make a statement to NCIS that night, even when they cautioned him about doing so.

Against this backdrop, SA Warshawsky administered a cleansing warning to Appellant, informing him that "any prior illegal admissions or other improperly obtained evidence which

14

incriminated [him could not] be used against [him] in a trial by court-martial." SA Warshawsky also advised Appellant of his Article 31(b) and Miranda rights. Appellant indicated that he understood these rights and that he desired to waive them. Only at that point did SA Warshawsky allow Appellant to make a statement.

In summary, the evidence shows that Appellant wanted to make a statement to NCIS, that he was determined to confess that evening, that he did not waver from that course, and that his confession to NCIS was knowingly and voluntarily made. His decision to confess did not result from Government exploitation of his immunized testimony. Under these circumstances, the Government has met its burden of affirmatively demonstrating that his statement was derived from a legitimate source wholly independent of the compelled testimony.

## C.   THE DECISION TO PROSECUTE

Although Appellant moved to suppress the testimonial use of his confession to NCIS, he did not move to dismiss the charges or otherwise allege at trial that the Government improperly used immunized testimony in the course of making the decision to prosecute. Under Rule for Courts-Martial 907(b)(2)(D)(ii), an allegation of improper use of immunized testimony in the prosecutorial decision constitutes a waivable basis for a motion to dismiss. In that context, we conduct a plain error review;

that is, we assess (1) whether there was an error; (2) if so, whether the error was plain or obvious; and (3) if the error was plain or obvious error, whether it was prejudicial. See United States v. Powell, 49 M.J. 460, 464-65 (C.A.A.F. 1998).

Although the investigation initially focused on Ms. Allen because of the estimated time of the abuse that resulted in CJ's hospitalization on March 6, 1996, Appellant became a suspect following the events of August 8 at which time CJ was in his sole custody. At the hospital team meeting on August 14 the focus shifted sharply to Appellant, a day before he made his statements to Ms. Wong and the others. Moreover, his statement to NCIS, which we have determined to be otherwise admissible, provided an independent basis for making the decision to prosecute. Under these circumstances, the preponderance of the evidence demonstrates that the prosecutorial decision was untainted by Appellant's statement to Ms. Wong. Olivero, 39 M.J. at 249; see also Mapes, 59 M.J. at 67. There was no error, much less plain error, in not dismissing the charges.


### III. CONCLUSION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.