**UNITED STATES**

v.

**Technical Sergeant Mark F. LEBARON,
United States Air Force**

**ACM 35299**

U.S. Air Force Court of Criminal Appeals.

Sentence adjudged 15 May 2002 by GCM
convened at Fairchild Air Force
Base, Washington.

23 December 2005

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, and Major James M. Winner.

Appellate Counsel for the United States: Colonel LeEllen Coacher and Major Steven J. Grocki.

Before STONE, SMITH, and MATHEWS, Appellate Military Judges

## OPINION OF THE COURT

STONE, Senior Judge:

The appellant pled guilty at a general court-martial to a single specification of committing an indecent act with his 13-year-old daughter, in violation of Article 134, UCMJ, 10 U.S.C. § 934. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for 15 months, and reduction to E–1.

The appellant raises two issues before this Court. First, he asserts he was denied due process of law because Air Force officials provided him with de facto immunity from prosecution. Alternatively, he claims the government engaged in prosecutorial misconduct. Although not raised as a separate issue, he further argues, also in the alternative, that his defense counsel was ineffective.[1] He asks that his conviction be set aside and dismissed. We hold that the appellant's due process rights were violated and return the case to the convening authority for action consistent with this opinion.

### Background

On the morning of 3 April 2001, the appellant went into his 13-year-old daughter's bed-

---

1. Failure to "separately" raise each assigned error is a violation of Rule 15(a) of the Courts of Criminal Appeals, Rules of Practice and Procedure (1 Aug 2004). We once again advise counsel that adherence to this rule facilitates the appellate process and ensures the rights of the parties are protected.

room to wake her up. While doing so, he kissed her mouth and face and rubbed her breasts, buttocks, and genital area with his hands. Upon awakening to her father's molestation, she ran into a nearby bathroom and locked the door.

This incident prompted the appellant to make a number of admissions. Immediately after the incident, he told his wife that he had just "petted" their daughter. He made similar admissions to his bishop, a church social services representative, and his first sergeant. Additionally, he reported the incident to Ms. Link, the family advocacy treatment manager at Fairchild Air Force Base. During the course of these disclosures, the appellant admitted to other instances of indecent conduct, to include inappropriately touching his 13-year-old daughter's thigh on another occasion, and a single incident of inappropriately touching his younger daughter.[2] He also admitted he indecently assaulted two of his female relatives as a juvenile. Soon after making these admissions, the appellant sought the advice of Captain (Capt) Bergenser, an area defense counsel, and stopped making incriminating statements.

After completing an investigation on 16 May 2001, base authorities discussed how best to handle the allegations. The options they discussed ranged from nonjudicial punishment, pursuant to Article 15, UCMJ, 10 U.S.C. § 815, to a general court-martial. The accused very much hoped he would be offered nonjudicial punishment pursuant to Article 15, and testimony at trial indicated the accused's squadron commanders had not ruled out imposition of an Article 15.

Based upon conversations she had with the appellant, Ms. Link, the family advocacy treatment manager, believed the appellant's squadron commander, Lieutenant Colonel (Lt Col) Ziny, was seriously considering Article 15 action. She was concerned that he was minimizing the situation. As a result, Ms. Link set up a meeting for 22 June 2001 to discuss the appellant's case. In addition to Ms. Link, the attendees included Lt Col Ziny and the appellant's section commander and first sergeant. Also included was Capt Rutherford, the chief of military justice from the base legal office. The group discussed various disciplinary options, but Lt Col Ziny made no decision on disposition of the charges. Ms. Link advised the commander to send the appellant to Dr. Colson, a certified sex therapist, for further evaluation. The commander agreed to this proposal.

Soon thereafter, the appellant's first sergeant advised the appellant he had an appointment with Dr. Colson on 26 June 2001. Based upon this conversation, the appellant believed he would receive an Article 15 if he cooperated in the evaluation process. At trial, the first sergeant testified and adamantly denied he made any such promise. Additionally, Lt Col Ziny and his predecessor in command offered testimony denying they ever told the appellant they were definitely disposing of the case with an Article 15. Consequently, the military judge entered a finding that no one with authority—apparent or otherwise—made a promise of any kind that the appellant would receive an Article 15 in exchange for agreeing to an evaluation by Dr. Colson. We find no reason to disturb this finding of fact, as we do not find it clearly erroneous.

Ms. Link did talk to the appellant about how his cooperation with Dr. Colson would be used. This discussion occurred prior to the appellant's appointment with Dr. Colson when he met with Ms. Link to sign paperwork allowing her to provide Dr. Colson with information about the case. In response to questions from the trial defense counsel—consistent with the appellant's testimony—Ms. Link testified at trial about this meeting as follows:

Q. Okay. Did [the appellant] ever ask you what that—what ever [sic] statements he made in the [psychological] evaluation or all the [diagnostic] tests he took, what it was going to be used for?

2. The three incidents involving his daughters formed the basis of the three specifications of indecent acts on a minor referred to trial by general court-martial. Pursuant to a pretrial agreement, the appellant pled guilty to the incident involving his 13-year-old daughter on 3 April 2001, and the two remaining specifications were dismissed with prejudice after entry of pleas.

A. No, I told him. He didn't ask me, I told him.

Q. Oh, what did you tell him?

A. I told him it would be used for further treatment.

Notwithstanding these assurances, the appellant continued to discuss the situation with Capt Bergenser and was clearly adhering to her advice on how to handle the matter. Capt Bergenser testified at trial that she was concerned about the evaluation with Dr. Colson, to include the plan for a polygraph. Thus, on 25 June 2001, the day prior to the appellant's appointment, she advised the appellant that the case may still go to court-martial, "but it most definitely would [go to court] if [he] cooperated with therapy." The appellant clearly understood Capt Bergenser's 25 June 2001 advice that a court-martial was still a viable option, despite his conversations with government officials. It is equally clear he would not have gone to the appointment with Dr. Colson without the recommendation of his defense counsel.

Skeptical about the psychological evaluation, Capt Bergenser sought to clarify the nature and purpose of the evaluation with Capt Rutherford, the chief of military justice. After several unsuccessful attempts to reach each other, they made telephonic contact on the morning of 26 June 2001, the day of the scheduled evaluation with Dr. Colson. At trial, the two attorneys offered significantly different versions of what was said during this conversation. The military judge's findings of fact on this point were as follows:

Regardless of what was actually said, there is no doubt in my mind that Captain Rutherford's comments to Captain Bergenser created a misunderstanding whereby Captain Bergenser was convinced the [appellant] was going to get an Article 15. It is inconceivable to me that Captain Bergenser would have consistently advised her client over a period of several months not to participate in treatment, including advising him on the very night before the evaluation not to participate in such an evaluation, unless Captain Rutherford had said something that led Captain Bergenser to believe her client was going to get an Article 15. However, it is equally inconceivable to me that Captain Rutherford would have provided a blank check to the [appellant]. That is to say that she would tell—or would have told Captain Bergenser that the accused would get an Article 15 regardless of what resulted from the evaluation. I am therefore convinced that Captain Rutherford did qualify her comments to Captain Bergenser by telling her, words to the effect, that the Article 15 disposition was contingent on there being no other misconduct. That is not to say that I question Captain Bergenser's credibly, I do not. In fact, I find her testimony to be very credible. However, while Captain Rutherford may not have specifically mentioned the term court-martial during her conversation with Captain Bergenser, I do believe she placed some qualification on her comments to Captain Bergenser that this case would be an Article 15. In any event, based on her conversation with Captain Rutherford and her understanding that the accused would be getting an Article 15, Captain Bergenser advised the [appellant] to participate in the evaluation and the attendant polygraph.

We find no reason to disturb these findings of the military judge.

The military judge further found that no one with authority, apparent or otherwise, gave the appellant immunity or made an explicit promise of any kind that the appellant would receive an Article 15 in exchange for agreeing to an evaluation by Dr. Colson. However, despite his conclusion that there was no de facto immunity, the military judge expressed concern about the circumstances under which the appellant participated in the evaluation. As to the suppression of any statements the appellant made during the evaluation, he concluded:

Captain Rutherford did make a comment or comments to Captain Bergenser that led her to believe that an Article 15 was going to be the outcome in the case. Capt Bergenser, in turn, advised the [appellant] to participate in Dr. Colson's evaluation based on her understanding that the [appellant] was going to get an Article 15. The [appellant] then relied on Captain Bergenser's advice and participated in Dr. Col-

sons' evaluation and the attendant polygraph. Dr. Colson's evaluation was then relied on to some extent by [the squadron commander] when he made the decision to [prefer] court-martial charges. Under these circumstances, while there may be no de facto immunity, it seems to me that it would be unfair to allow the government to profit from a misunderstanding they were primarily responsible for creating. The government had ample information upon which to make a decision as of 26 June 2001. And instead of making a decision with what they had, or based on what they had, they decided to garner more information. This effort resulted in a misunderstanding on both sides regarding what was going to happen. This misunderstanding could have been avoided. I do not believe Captain Rutherford's conduct was so egregious or so flagrant that dismissal of the charges is appropriate; however, I believe the government should not be allowed to profit from the misunderstanding she created either. More specifically, I do not believe the government should be allowed to use statements the accused made during Dr. Colson's evaluation and the attendant polygraph, as well as any derivative evidence there from for any purpose at this trial.

Based on these findings and conclusions, which we adopt, the military judge prohibited the use of any statements the accused made during Dr. Colson's examination and the subsequent polygraph, as well as any derivative evidence "for any purpose at this court-martial."

*Waiver*

As a preliminary matter, the government argues that because the appellant pled guilty unconditionally, the issue of de facto immunity is waived. *See* Rules for Courts–Martial (R.C.M.) 907(b)(2)(D)(ii) and 910(j). *See also United States v. Allen*, 59 M.J. 478, 483 (C.A.A.F.), *cert. denied*, 543 U.S. 877, 125 S.Ct. 96, 160 L.Ed.2d 128 (2004) (an "allegation of improper use of immunized testimony in the prosecutorial decision constitutes a waivable basis for a motion to dismiss"). If the issue was waived by the appellant's unconditional pleas, we would conduct the three-part analysis set forth in *United States v. Powell*, 49 M.J. 460, 464–65 (C.A.A.F. 1998), to determine if there was plain error. *Allen*, 59 M.J. at 483.

The appellant's pretrial agreement had a provision waiving all "waivable" motions. Despite this provision, the parties and military judge nonetheless agreed the motion was not waived by the pretrial agreement, thereby complying with the provisions of R.C.M. 910(a)(2), which governs the entry of a conditional guilty plea and requires the "approval of the military judge and the consent of the Government." However, *Air Force Instruction* 51–201, Administration of Military Justice, ¶ 8.2 (26 Nov 2003), requires a conditional guilty plea to be in writing and approved by the staff judge advocate (SJA) or acting SJA. There was no compliance with this very specific procedural guidance, which is intended to prevent the very type of misunderstanding we are confronted with in the case at hand. In any event, we do not need to determine whether waiver applies in this case because we reach the same result whether we conduct a plain error review or a more deferential analysis.

*Analysis*

Only a general court-martial convening authority may grant testimonial or transactional immunity. R.C.M. 704(c). That power may not be delegated and, when exercised, must be in writing. *Id.* Adherence to this procedural rule avoids unnecessary confusion, protects the rights of the immunized servicemember, and enhances the orderly administration of justice. *See generally United States v. Jones*, 52 M.J. 60 (C.A.A.F. 1999) ("putting … immunity and Article 15 agreements in writing eliminates impermissible terms, and such an open document will build public confidence in the military criminal justice system").

De facto immunity, sometimes called "equitable immunity," is a judicially-created method of dealing with situations where persons not authorized to grant immunity engage in conduct or discussions that, under the totality of the circumstances, lead an accused to reasonably believe he or she had immunity. *United States v. Wagner*, 35 M.J.

721, 724 (A.F.C.M.R. 1992); *United States v. Spence*, 29 M.J. 630, 635 (A.F.C.M.R. 1989).

The doctrinal underpinnings of de facto immunity rest on due process concerns. "[D]e facto immunity exists when there is a judicial determination that due process requires that the [governmental] actions taken constitute immunity[.]" *Jones*, 52 M.J. at 65. *See also Cooke v. Orser*, 12 M.J. 335, 342–43 (C.M.A. 1982). In evaluating due process claims such as that raised by the appellant in the present case, we note that military criminal jurisprudence reflects broad policy and constitutional concerns affecting the fairness of the prosecutorial decision, for example: (1) avoidance of sub rosa pretrial agreements; (2) potential violations of the right to remain silent as set forth in Article 31, UCMJ, 10 U.S.C. § 831, and the Fifth Amendment to the United States Constitution; (3) unlawful command influence as prohibited in Article 37(a), UCMJ, 10 U.S.C. § 837(a); (4) the right to effective assistance of counsel as set forth in the Sixth Amendment to the Constitution; and (5) prosecutorial misconduct as defined in various ethical standards. All but (3) are implicated in the case at hand.

This case involves a poorly coordinated decision to send the appellant for a psychological evaluation. Ordinarily, an appellant has the burden of persuasion that he or she was given an enforceable promise of immunity. *Samples v. Vest*, 38 M.J. 482, 482 (C.M.A. 1994). But because de facto immunity is an equitable doctrine based on the totality of circumstances, military courts have often concluded that misunderstandings as to the terms of any agreement are held against the government. *See, e.g., United States v. Kimble*, 33 M.J. 284, 289–90 (C.M.A. 1991); *United States v. Wagner*, 35 M.J. 721, 728 (A.F.C.M.R. 1992). *See also Cunningham v. Gilevich*, 36 M.J. 94, 102–03 (C.M.A. 1992) (J.

Sullivan concurring in part) ("it is the legal duty of a convening authority and his surrogates to act in a forthright and unambiguous manner when offering immunity to a servicemember").

The military judge determined that the circumstances of this case did not establish de facto immunity, but concluded, apparently as a matter of due process, that it would "be unfair to allow the government to profit from a misunderstanding they were primarily responsible for creating." Because the government's conduct was not egregious or flagrant, he concluded, dismissal of the charge and its specifications was not appropriate. His remedy was to preclude the government from using any of the appellant's statements at trial. Although he specifically concluded there was no de facto immunity, his remedy was an apparent effort to ameliorate an unfair circumstance created by the government.[3]

We conclude that the totality of the circumstances warrants application of the equitable doctrine of de facto *testimonial* immunity. It was apparent to all of the players that the commander had not ruled out the possibility of Article 15 action and was struggling with how to assess the gravity of the appellant's inappropriate behavior with his daughters. The government concluded that the best way to resolve the dilemma was to solicit information from the appellant through an informal agreement. In soliciting this agreement, Capt Rutherford failed to convey a clear understanding of the commander's intent and purpose, especially given the circumstances surrounding the last-minute telephone call. In this context, it is clear the appellant was relying in good faith on the advice of his counsel, who was unintentionally misled into believing the appellant was only facing an Article 15.[4]

---

3. We also concur with his implicit determination that the government's conduct did not rise to the level of prosecutorial misconduct, defined as when a "prosecuting attorney overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Berger v. United States*, 295 U.S. 78, 84, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

4. Imposition of punishment pursuant to Article 15 is not a bar to a later trial by court-martial for the same offense, assuming it is a "major" offense. *United States v. Joseph*, 11 M.J. 333, 334–35 (C.M.A. 1981). The record does not establish whether Capt Bergenser was unaware of this rule and advised her client on the belief an Article 15 would bar further prosecution of her client. Consequently, we find no merit to the

## Remedy

The next question to resolve, then, is the adequacy of the military judge's remedy. In *Cooke v. Orser*, the Court of Military Appeals (CMA) concluded that "absent demonstrable prejudice, or substantial threat thereof, dismissal [of the charges] is plainly inappropriate," even for deliberate constitutional violations. *Orser*, 12 M.J. at 345. CMA noted that "the usual approach adopted by the Supreme Court in fashioning a constitutional remedy is 'to identify' the taint in the criminal proceeding and 'neutralize' it 'by tailoring relief appropriate in the circumstances to assure the defendant due process of law' and a 'fair trial.'" *Id.* (citing *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981)).

Our careful review of the record reveals the statements the appellant made to Dr. Colson were not used as evidence to support the charged offenses. They were preferred based solely on the admissions he made on numerous occasions prior to seeing Dr. Colson. Nor were his admissions to Dr. Colson used in any manner during his trial.

■ However, it is another matter when we examine the prosecutorial decision itself. The government has a "heavy burden" to establish that its decision to prosecute is untainted by immunized testimony. *Kastigar v. United States*, 406 U.S. 441, 461, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Allen*, 59 M.J. at 482; *United States v. Olivero*, 39 M.J. 246, 249 (C.M.A. 1994); and *United States v. Mapes*, 59 M.J. 60, 67 (C.A.A.F. 2003). The underlying principle is that an accused and the government should be left in essentially the same position after de facto immunity was given as they were beforehand. *Kastigar*, 406 U.S. at 461, 92 S.Ct. 1653.

The military judge found that prior to the appellant's psychological evaluation, the appellant's squadron commander "had not yet decided how to dispose of the case. However since he had never been involved in a case such as this, he was leaning towards court-martial action." The military judge went on to conclude that when the commander reviewed Dr. Colson's evaluation of the appel-

lant, this information only "reinforced" his opinion that the case should not be disposed of through Article 15 action.

■ "A military judge's finding that the decision to prosecute ... is independent of the immunized testimony should not be overturned on appeal unless it is clearly erroneous or unsupported by the evidence." *United States v. McGeeney*, 44 M.J. 418, 423 (C.A.A.F. 1996). Applying this standard of review, we conclude the military judge's determination that the appellant's statements to Dr. Colson did not influence the prosecutorial decision was clearly erroneous and unsupported by the evidence.

The record clearly reveals that Lt Col Ziny had not made a decision—tentative or otherwise—to prefer court-martial charges prior to the appellant talking to Dr. Colson. Indeed, trial counsel asked Lt Col Ziny to describe how he intended to handle the case prior to his 22 June meeting with Ms. Link. Lt Col Ziny responded:

I had no final decision. This is the first case of this kind that I have dealt with. So, I needed advice from, really, from two avenues. One, from the medical community ... [as to] exactly what kind of behavior is this. I mean, I know in general terms what it is, but what, specifically, with [the appellant]. You know, is this a one time event, is it something that he was [sic] been involved in for a long time, or is it the start of something that could be on-going. You need some sort of perspective."

When asked about the meeting with Ms. Link, the commander responded that Ms. Link "said that they really didn't have the expertise on their staff to properly evaluate [the appellant's case]. So, what I said was, I need somebody who can study this or give me some advice here on the broader picture. And at that time, they made the recommendation of going to an expert downtown."

More importantly, in response to a question from trial counsel asking the commander when he made a final determination as to whether this was "an Article 15 type issue or a court-martial issue," he responded:

appellant's claim that he received ineffective as-   sistance of counsel.

A. I believe it was late September [after Dr. Colson's report was complete]. ... There was one very specific passage [from the report] ... at which point, I realized that this is definitely not an Article 15 situation.

Q. What was that passage?

A. The passage related to [the appellant] had—had told, I believe, on the polygraph, that there was a time where either one or both of the [sic] his daughters was in his house and he exposed his erect penis to them. And at that point, I said, this is not something that I can judge on my own.

Finally, in concluding that the appellant was not entitled to dismissal of the charge and specifications, the military judge apparently used an incorrect legal standard for assessing whether the immunized statements tainted the prosecutorial decision. Specifically, the military judge concluded that the appellant's statements to Dr. Colson only "reinforced" Lt Col Ziny's decision to go to trial. However, the proper standard is whether the protected statements played "any" role in the decision to prosecute. *United States v. Youngman*, 48 M.J. 123, 127 (C.A.A.F. 1998); *Kimble*, 33 M.J. at 291. We hold that the appellant's statements made to Dr. Colson clearly played a role in Lt Col Ziny's decision to prefer charges.

Although the military judge was not presented with evidence on the referral decision, we also find that the immunized statements played a role in the *referral* decision. In his pretrial advice, the SJA advised the convening authority that the "accused has since undergone a psycholsexual [sic] evaluation which diagnosed him with pedophilia." Also, the investigating officer who conducted the pretrial investigation of the charges pursuant to Article 32, UCMJ, 10 U.S.C. § 832, included information about the appellant exposing his penis to his daughters and also referenced Dr. Colson's diagnosis of the appellant as a pedophile. The report and advice, of course, played a role in the referral process.

Having determined that the protected information from Dr. Colson's report "caused or played a substantial role in the preferral and referral decisions," we conclude the government did not meet its heavy burden to show this information played "no role" in the prosecutorial decision. *See Youngman*, 48 M.J. at 127.

In sum, the commander was obviously sitting on the fence. His ambivalence was the reason Ms. Link called the meeting and suggested the appellant be evaluated. The government initiated a proposal that was highly irregular, leading to the appellant's misunderstanding as to how his cooperation in an evaluation would be used against him. No evidence suggests bad faith on the part of the appellant. He honestly and reasonably relied upon the advice of his counsel, who rendered advice based upon a misunderstanding with the chief of military justice. These circumstances violated the appellant's due process rights and warrant application of the equitable doctrine of de facto testimonial immunity. However, we do not find any impact on the offenses as charged, but do conclude the preferral and referral decisions were tainted.

*Conclusion*

Accordingly, the findings and sentence are set aside. R.C.M. 910(a)(2). The record of trial is returned to The Judge Advocate General of the Air Force for submission to a new convening authority for further action consistent with this case. *See Mapes*, 59 M.J. at 72; *Youngman*, 48 M.J. at 129, n.2. The new convening authority may either terminate the prosecution or designate a member of the command to review the case file without considering information related to Dr. Colson's report or any derivative evidence. If a charge is preferred, the government will have the burden of showing that any evidence presented in support of those charges is untainted by the Dr. Colson's evaluation. *See also Gilevich*, 36 M.J. at 102 (decretal paragraph).